Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

v.

RAYMOND LEE SCOTT,
    *Defendant-Appellee.*

No. 04-10090

D.C. No.
CR-03-00122-DWH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
David Warner Hagen, District Judge, Presiding

Argued and Submitted
December 10, 2004—San Francisco, California

Filed September 9, 2005
Amended June 9, 2006

Before: Alex Kozinski, William A. Fletcher and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Kozinski;
Dissent by Judge Bybee;
Dissent from Denial of Rehearing En Banc
by Judge Callahan

**COUNSEL**

Paul L. Pugliese, Assistant United States Attorney, Reno, Nevada, for the plaintiff-appellant.

Michael K. Powell and Cynthia S. Hahn, Reno, Nevada, for the defendant-appellee.

---

**ORDER**

The opinion and dissent filed September 9, 2005, and reported at 424 F.3d 888, is withdrawn, and is replaced by the Amended Opinion and Amended Dissent, 04-10090. The petition for rehearing is otherwise denied.

A judge requested a vote on whether to rehear this case en banc. The case failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED**. No further petitions for rehearing or rehearing en banc will be accepted.

---

**OPINION**

KOZINSKI, Circuit Judge:

We consider whether police may conduct a search based on less than probable cause of an individual released while awaiting trial. This issue is one of first impression in our circuit. Somewhat surprisingly, it is an issue of first impression in any federal circuit and the vast majority of state courts.[1] A

---

[1]The dissent points to only two states whose supreme courts have addressed this issue: Maine and California. *See* dissent at 6472 (citing *State* v. *Ullring*, 741 A.2d 1065 (Me. 1999); *In re York*, 892 P.2d 804

lack of binding precedent does not, of course, excuse us from deciding a difficult issue when, as here, it is squarely presented.

## Facts

Scott was arrested in Nevada on state charges of drug possession and released on his own recognizance. In order to qualify for release, Scott was required to sign a form stating that he agreed to comply with certain conditions. Among the conditions was consent to "random" drug testing "anytime of the day or night by any peace officer without a warrant," and to having his home searched for drugs "by any peace officer anytime[,] day or night[,] without a warrant." There is no evidence that the conditions were the result of findings made after any sort of hearing; rather, the United States concedes that the conditions were merely "checked off by a judge from a standard list of pre-trial release conditions."

Based on an informant's tip, state officers went to Scott's

(Cal. 1995)). It is unclear whether those cases would come out the same way today, as both were decided before *United States* v. *Knights*, 534 U.S. 112 (2001) (discussed in section 3 *infra*) and *Ferguson* v. *City of Charleston*, 532 U.S. 67 (2001) (discussed in section 2 *infra*). Further, the California case involved a different procedural posture than our case, as it came up on habeas review rather than on direct appeal. *See York*, 892 P.2d at 806.

Appellate courts in Indiana and the District of Columbia also have addressed the issue, with mixed results. *See Steiner* v. *State*, 763 N.E.2d 1024 (Ind. Ct. App. 2002); *Harvey* v. *State*, 751 N.E.2d 254 (Ind. Ct. App. 2001); *Oliver* v. *United States*, 682 A.2d 186 (D.C. 1996). Although the D.C. court upheld certain bail conditions pre-*Knights* and *Ferguson*, *see Oliver*, 682 A.2d at 187, the Indiana court struck down a pretrial release condition imposing random drug screens as unreasonable post-*Knights* and *Ferguson*. *See Steiner*, 763 N.E.2d at 1028. Earlier, the Indiana court declined to reach the same issue in *Harvey*, finding the defendant had waived his objection to the condition of release. *See Harvey*, 751 N.E.2d at 259.

house and administered a urine test. The government concedes the tip did not establish probable cause. When Scott tested positive for methamphetamine,[2] the officers arrested him and searched his house. The search ultimately turned up a shotgun.

A federal grand jury indicted Scott for unlawfully possessing an unregistered shotgun.[3] The district court granted Scott's motion to suppress the shotgun and statements he had made to the officers concerning it, reasoning that the officers needed probable cause to justify the warrantless search. The federal government took an interlocutory appeal pursuant to 18 U.S.C. § 3731.

## Discussion

**1.** We first examine whether the searches—the drug test and the search of Scott's house—were valid because Scott consented to them as a condition of his release.[4]

---

[2]Though Scott's urine sample tested positive in both the field test and a subsequent test using the enzyme multiplied immunoassay technique, he claimed that he had not used methamphetamine since his arrest. Because Scott continued to dispute the accuracy of the tests, the state tested the same sample using the gas chromatography/mass spectrometry method, which is considered to be more accurate, *see Schaill* v. *Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1311 (7th Cir. 1989). This third test came back negative, supporting Scott's contention that the initial positive results were due to his allergy medication.

[3]It is unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d).

[4]The dissent mistakenly describes this as "a question of whether the Fourth Amendment permits Scott to waive his Fourth Amendment rights." Dissent at 6486. No one disputes that Fourth Amendment rights can be waived. *See Schneckloth* v. *Bustamonte*, 412 U.S. 218, 228 (1973). The question here is whether the government can *induce* Scott to waive his Fourth Amendment rights by conditioning pretrial release on such a waiver.

**[1]** The government may detain an arrestee "to ensure his presence at trial," *Bell* v. *Wolfish*, 441 U.S. 520, 536 (1979), and may impose some conditions, such as reasonable bail, before releasing him, *see United States* v. *Salerno*, 481 U.S. 739, 754 (1987). Many pre-trial detainees willingly consent to such conditions, preferring to give up some rights in order to sleep in their own beds while awaiting trial.

**[2]** It may be tempting to say that such transactions—where a citizen waives certain rights in exchange for a valuable benefit the government is under no duty to grant—are always permissible and, indeed, should be encouraged as contributing to social welfare. After all, Scott's options were only expanded when he was given the choice to waive his Fourth Amendment rights or stay in jail. *Cf. Doyle* v. *Cont'l Ins. Co.*, 94 U.S. 535, 542 (1877). But our constitutional law has not adopted this philosophy wholesale. The "unconstitutional conditions" doctrine, *cf. Dolan* v. *City of Tigard*, 512 U.S. 374, 385 (1994), limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary.[5] Government is a monopoly

---

[5]We assume for purposes of our analysis that releasing Scott on his own recognizance was a discretionary decision. We note, however, that under the Excessive Bail Clause (to the extent it applies against the states), "the Government's proposed conditions of release or detention [must] not be 'excessive' in light of the perceived evil." *Salerno*, 481 U.S. at 754; *see also Schilb* v. *Kuebel*, 404 U.S. 357, 365 (1971) ("[T]he Eighth Amendment's proscription of excessive bail has been assumed to have application to the States through the Fourteenth Amendment."); *Browning-Ferris Indus. of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U.S. 257, 284 (1989) (O'Connor, J., dissenting in part) (similar). There may thus be cases where the risk of flight is so slight that any amount of bail is excessive; release on one's own recognizance would then be constitutionally required, which could further limit the government's discretion to fashion conditions of release.

The dissent concedes that "there are . . . limits to what the government may demand from an OR releasee." Dissent at 6488. Indeed, the fact that a state may be able to deny bail to someone—or indeed everyone—who

provider of countless services, notably law enforcement, and we live in an age when government influence and control are pervasive in many aspects of our daily lives. Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and gradually eroding constitutional protections. Where a constitutional right "functions to preserve spheres of autonomy . . . [u]nconstitutional conditions doctrine protects that [sphere] by preventing governmental end-runs around the barriers to direct commands." Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1492 (1989); *see generally id.* at 1489-1505; Richard A. Epstein, *The Supreme Court, 1987 Term—Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 4, 21-25 (1988).

---

is accused of a crime says nothing about the amount of bail it may set once it decides to release an accused pending trial. It would be highly impractical and politically impossible for a state to jail all criminal defendants—including those accused of traffic offenses—pending trial. The state must thus make pragmatic decisions about releasing some while detaining others. The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions—such as chopping off a finger or giving up one's first-born. Once a state decides to release a criminal defendant pending trial, the state may impose only such conditions as are constitutional, including compliance with the prohibition against excessive bail. In some instances—when flight would be irrational, such as when the crime involves a minor traffic infraction—*any* amount of bail may be excessive because the bail amount would not serve the purpose of ensuring appearance in court to answer the charges. For example, a person arrested for speeding on a California highway cannot be detained pending trial, but must be released after signing a "notice to appear." *See* Cal. Veh. Code §§ 40500(a), 40504(a). This appears to be a legislative determination that a person arrested for violating the Vehicle Code who satisfies the conditions of section 40504(a) is not a sufficient flight risk or danger to the community to require incarceration pending trial. This legislative determination that bail would serve no relevant purpose implies that, for such a violation, any amount of bail would be constitutionally excessive.

**[3]** The doctrine is especially important in the Fourth Amendment context. Under modern Fourth Amendment jurisprudence, whether a search has occurred depends on whether a reasonable expectation of privacy has been violated. *See Katz* v. *United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). While the *Katz* principle was originally used to *expand* Fourth Amendment protection to cover government invasions of privacy in public places like phone booths, it can also serve to *contract* such protection in private places such as homes. As the Court recently explained in *Kyllo* v. *United States*, 533 U.S. 27 (2001):

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz*. . . . As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. We have subsequently applied this principle to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable."

*Id.* at 32-33 (quoting *California* v. *Ciraolo*, 476 U.S. 207, 211 (1986)) (citation omitted) (alteration in original); *see also United States* v. *Kincade*, 379 F.3d 813, 873 (9th Cir. 2004) (en banc) (Kozinski, J., dissenting).

The focus on subjective expectations can give rise to the following chain of logic: By assenting to warrantless house searches and random, warrantless urine tests, Scott destroyed his subjective expectation of privacy, and this in turn made his searches no longer searches, depriving him of Fourth Amendment protection altogether. But the Supreme Court has

resisted this logic, recognizing the slippery-slope potential of the *Katz* doctrine:

> [I]f the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. . . . In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

*Smith* v. *Maryland*, 442 U.S. 735, 740 n.5 (1979).

**[4]** Pervasively imposing an intrusive search regime as the price of pre-trial release, just like imposing such a regime outright, can contribute to the downward ratchet of privacy expectations. While government may sometimes condition benefits on waiver of Fourth Amendment rights—for instance, when dealing with contractors, *see Zap* v. *United States*, 328 U.S. 624, 628 (1946); *Yin* v. *California*, 95 F.3d 864, 872 (9th Cir. 1996) ("It is clear that a contract may under appropriate circumstances diminish (if not extinguish) legitimate expectations of privacy."), or paying welfare benefits, *see Wyman* v. *James*, 400 U.S. 309, 317-18 (1971)—its power to do so is not unlimited.

Government employees, for example, do not waive their Fourth Amendment rights simply by accepting a government job; searches of government employees must still be reasonable. *See Nat'l Treasury Employees Union* v. *Von Raab*, 489 U.S. 656, 665 (1989) (citing *O'Connor* v. *Ortega*, 480 U.S.

709, 717 (1987) (plurality opinion); *id.* at 731 (Scalia, J., concurring in the judgment)). *Von Raab* also forecloses a milder version of the waiver theory, which would hold that an employee keeps his Fourth Amendment rights but makes all searches reasonable through his consent: The employee's assent is merely a relevant factor in determining how strong his expectation of privacy is, *see id.* at 672 n.2, and thus may contribute to a finding of reasonableness. *See* page 6462 *infra*.

**[5]** The government is obviously subject to no fewer constraints when acting as sovereign than as employer, and deciding whether someone charged with a crime will be incarcerated before a determination of guilt is unquestionably a sovereign prerogative. "[O]ne who has been released on pre-trial bail does not lose his or her Fourth Amendment right to be free of unreasonable seizures," *Cruz* v. *Kauai County*, 279 F.3d 1064, 1068 (9th Cir. 2002), and we have previously held that probationers (a group more readily subject to restrictions than pre-trial releasees, *see* pages 6460-64 *infra*) do not waive their Fourth Amendment rights by agreeing, as a condition of probation, to "submit [their] person and property to search at any time upon request by a law enforcement officer." *United States* v. *Consuelo-Gonzalez*, 521 F.2d 259, 261 (9th Cir. 1975) (en banc); *see also id.* at 262 ("[A]ny search made pursuant to the condition included in the terms of probation must necessarily meet the Fourth Amendment's standard of reasonableness.").

**[6]** Therefore, Scott's consent to any search is only valid if the search in question (taking the fact of consent into account) was reasonable. To this inquiry we now turn.

**[7] 2.** Usually, Fourth Amendment reasonableness means that a search or seizure must be supported by probable cause, though pat-downs and similar minor intrusions need only be supported by reasonable suspicion. *See Terry* v. *Ohio*, 392 U.S. 1 (1968); *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975). But we relax these requirements "when 'spe-

cial needs, beyond the normal need for law enforcement,' " make an insistence on the otherwise applicable level of suspicion " 'impracticable.' " *Griffin* v. *Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *New Jersey* v. *T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in the judgment)); *City of Indianapolis* v. *Edmond*, 531 U.S. 32, 37 (2000). Thus, when probable cause would normally be required, "special needs" can justify searches based on less, *see id.*; *Vernonia Sch. Dist. 47J* v. *Acton*, 515 U.S. 646, 653, 664-65 (1995) (suspicionless drug testing of student athletes). When reasonable suspicion would normally be required, special needs may justify suspicionless seizures, *see Edmond*, 531 U.S. at 39 (citing *Mich. Dep't of State Police* v. *Sitz*, 496 U.S. 444 (1990) (sobriety checkpoint), as such a case).

The United States argues here that searching pre-trial releasees by testing them for drugs serves two special needs: (1) protecting the community from criminal defendants released pending trial and (2) ensuring that defendants show up at trial. But—at most—only the second of these claimed needs is, as the special needs exception requires, "beyond the normal need for law enforcement."

Two recent Supreme Court cases illustrate this important limitation on the special needs doctrine. In *Edmond*, the Court invalidated a roadside checkpoint program aimed at enforcing drug laws through drug-sniffing dogs and visual inspection of cars. *See* 531 U.S. at 35. The Court started with the observation that the suspicionless checkpoint stops were Fourth Amendment seizures requiring individualized suspicion. *See id.* at 40-41. It noted that it had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Id.* at 41. Rather, suspicionless checkpoint stops are constitutional only if their primary purpose is separate from the "general interest in crime control." *Id.* (quoting *Delaware* v. *Prouse*, 440 U.S. 648, 659 n.18 (1979)) (internal quotation marks omitted). Programs designed to secure the border, *see United States* v. *Martinez-*

*Fuerte*, 428 U.S. 543, 556-57 (1976), or promote highway safety, *see Sitz*, 496 U.S. at 451, are thus different from programs whose purpose is to deter and punish violations of ordinary criminal laws.

For much the same reason, in *Ferguson* v. *City of Charleston*, 532 U.S. 67 (2001), the Court invalidated a state hospital's practice of testing pregnant women for cocaine and providing the results to the police. The Court had upheld suspicionless drug testing programs before, but in those cases, "the 'special need' . . . was one divorced from the State's general interest in law enforcement." *Id.* at 79; *see also id.* at 77 (citing *Skinner* v. *Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) (drug testing of railroad employees to prevent railway accidents); *Von Raab*, 489 U.S. at 656 (drug testing of Customs employees to ensure their integrity and physical fitness); *Vernonia*, 515 U.S. at 646 (drug testing of student athletes to maintain order in schools)). In *Ferguson*, however, "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." *Id.* at 80. The Court considered the government's argument that the "ultimate purpose" of the testing program was the "beneficent" goal of "protecting the health of both mother and child," but nonetheless concluded that "the purpose actually served . . . 'is ultimately indistinguishable from the general interest in crime control.' " *Id.* at 81 (quoting *Edmond*, 531 U.S. at 44).

[8] *Edmond*'s and *Ferguson*'s focus on "primary" or "ultimate" purposes requires us to examine the various possible purposes of the search here and determine which are primary. Because the subjective intent of the officers carrying out the search generally plays no role in assessing its constitutionality, *see Whren* v. *United States*, 517 U.S. 806, 813 (1996), special needs analysis calls for an inquiry into "programmatic purposes," *see Edmond*, 531 U.S. at 45-47; *Ferguson*, 532 U.S. at 81 ("In looking to the programmatic purpose, we con-

sider all the available evidence in order to determine the relevant primary purpose.").

**[9]** The government's first identified purpose, protecting the community, presumably means protecting it from the criminal activities of pre-trial releasees generally. *See* Nev. Rev. Stat. § 178.4851(2); *see also id.* § 178.4853(9) (listing "[t]he likelihood of more criminal activity by [the releasee] after he is released" as one factor to be considered before release without bail). The dissent points out correctly that the " 'government's interest in preventing crime by arrestees is both legitimate and compelling,' " dissent at 6481 (quoting *Salerno*, 481 U.S. at 749). But the government's interest in preventing crime by *anyone* is legitimate and compelling. *See, e.g.*, *United States* v. *Restrepo*, 946 F.2d 654, 674 (9th Cir. 1991) (en banc) (Norris, J., dissenting) ("It goes without saying that the government has a compelling interest in protecting the community from crime.").[6] Crime prevention is a quintessential general law enforcement purpose and therefore is the exact opposite of a special need.

The second purpose, ensuring that pre-trial releasees appear in court, fares somewhat better: While it has a law enforcement component—a defendant's failure to appear in court when ordered to do so is a criminal offense, *see* Nev. Rev. Stat. § 199.335—it also implicates the efficient functioning and integrity of the judicial system, *cf. State* v. *Ullring*, 741 A.2d 1065, 1068 (Me. 1999), a purpose separate from the general interest in crime control.

**[10]** We assume for purposes of our analysis that the non-law-enforcement purpose—the interest in judicial efficiency —is "primary" in this case. But the connection between the object of the test (drug use) and the harm to be avoided (non-

---

[6]In fact, two sentences after the phrase quoted by the dissent, the Court in *Salerno* describes the government's interest as a "general concern with crime prevention." *Salerno*, 481 U.S. at 749.

appearance in court) is tenuous. One might imagine that a defendant who uses drugs while on pre-trial release could be so overcome by the experience that he misses his court date. Or, having made it to court, he may be too mentally impaired to participate meaningfully in the proceedings. These are conceivable justifications, but the government has produced nothing to suggest these problems are common enough to justify intruding on the privacy rights of every single defendant out on pre-trial release. And it has produced nothing to suggest that Nevada found Scott to be particularly likely to engage in future drug use that would decrease his likelihood of appearing at trial.

Drug use during pre-trial release may also result in a defendant's general unreliability or, more nefariously, an increased likelihood of absconding. Whether this is plausible depends on whether drug use is a good predictor of these harms—a case that must be established empirically by the government when it seeks to impose the drug testing condition. But Nevada never attempted such an empirical demonstration in this case.

The Supreme Court has criticized assertions of special needs based on "hypothetical" hazards that are unsupported by "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Chandler*, 520 U.S. at 319. "A demonstrated problem" of drug use leading to nonappearance "would shore up" the government's assertion of a special need. *See id.*[7] As far as we can tell, the

---

[7]To be sure, such a showing is "not in all cases necessary." *Chandler*, 520 U.S. at 319. In *Von Raab*, the Supreme Court upheld a regime of suspicionless testing of Customs employees even though it was not "implemented in response to any perceived drug problem" and had not "led to the discovery of a significant number of drug users." 489 U.S. at 673. But, as the Court later explained in *Chandler*, the Customs employees in *Von Raab* were directly involved in drug interdiction, had "access to vast sources of valuable contraband," 520 U.S. at 321 (quoting *Von Raab*, 489

Nevada legislature has not taken the categorical position that drug use among pre-trial releasees substantially impairs their tendency to show up in court; instead, it has largely left appropriate release conditions to be determined in individual cases.[8] *See* Nev. Rev. Stat. §§ 178.484-.4853. Nor are courts instructed to limit their consideration to the non-law-enforcement purposes that might justify special needs searches: Release conditions may *both* "protect the health, safety and welfare of the community *and* . . . ensure that [the releasee] will appear at all times and places ordered by the court." *See id.* § 178.4851(2) (emphasis added); *see also id.* § 178.4853(7)-(9). We are thus unable to conclude that the search regime to which Scott was subjected was necessary to ensure his appearance at trial.[9]

[11] We are especially reluctant to indulge the claimed special need here because Scott's privacy interest in his home, where the officers came to demand the urine sample, is at its zenith. "[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion

U.S. at 669) (internal quotation marks omitted) and were exposed to bribery attempts. *Von Raab*, in other words, was "[h]ardly a decision opening broad vistas for suspicionless searches" and "must be read in its unique context." *Id.* at 321. Here there is no obvious connection between drug use and appearance in court sufficient to obviate the need for a showing of factual nexus.

[8]This is different from the federal bail system. Unlike the Nevada legislature, Congress seems to have recognized some connection between drug use and nonappearance at trial. *See* 18 U.S.C. §§ 3142(c)(1)(B)(ix), (x). Had defendant been on bail under the federal system, such a legislative finding, coupled with the fact that Scott was arrested for a drug-related crime, may have warranted a different outcome. We express no view on this point except to note that any such determination will require a careful examination of the federal Bail Reform Act.

[9]The dissent does no better. *See* dissent at 6482. After speculating for one paragraph why the state might have linked drug testing to attendance at trial, the dissent ends up justifying the drug testing only by referring once again to general crime prevention purposes. *Id.* at 6483.

not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *United States* v. *Karo*, 468 U.S. 705, 714 (1984); *see also Payton* v. *New York*, 445 U.S. 573, 589 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ."). Unlike public school students, who have limited privacy interests because of the state's special custodial role, *see Bd. of Educ. of Indep. Sch. Dist. No. 92* v. *Earls*, 536 U.S. 822, 830 (2002), Customs employees, who occupy sensitive government positions, *see Von Raab*, 489 U.S. at 669, or drivers and railway employees, whose activities impose safety risks on others, *see Sitz*, 496 U.S. at 451; *Skinner*, 489 U.S. at 620, pre-trial releasees are ordinary people who have been accused of a crime but are presumed innocent. We have already noted that Scott's assent to his release conditions does not by itself make an otherwise unreasonable search reasonable, *see* section 1 *supra*; to the extent his assent decreased his reasonable expectation of privacy, we hold that the decrease was insufficient to eliminate his expectation of privacy in his home.[10]

[12] *Griffin*, where the Supreme Court upheld the search of a probationer's home without probable cause, is not to the contrary. Griffin was on probation rather than pretrial release. *See* 483 U.S. at 870. The Court wrote that "[a] State's operation of a probation system, like its operation of a school, government office or prison," presents special needs, *id.* at 873-74, and that the goals of probation would be disrupted by a warrant or probable cause requirement, *id.* at 875-80. But pretrial releasees are not probationers. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.' " *Id.* at

---

[10]The balance usually will be struck differently in cases where the defendant is required to report for drug-testing at a location away from his home.

874 (quoting G. Killinger et al., *Probation and Parole in the Criminal Justice System* 14 (1976)). Years later, the *Ferguson* Court explained that "*Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large." 532 U.S. at 80 n.15. People released pending trial, by contrast, have suffered no judicial abridgment of their constitutional rights.[11]

**[13]** Because the government failed to demonstrate that Nevada had special needs for obtaining the drug-testing release condition, it cannot justify the search—testing Scott for drugs without probable cause—using this approach.[12] As discussed above, we hold only that the government has not made the requisite special needs showing in this case: It has not, for example, demonstrated a pattern of "drug use leading to nonappearance" in court, p. 6458 *supra*, nor pointed to an individualized determination that Scott's drug use was likely to lead to his nonappearance. The government in this case has relied on nothing more than a generalized need to protect the community and a blanket assertion that drug-testing is needed to ensure Scott's appearance at trial. Both are insufficient.[13]

---

[11]It is true, as the dissent points out, that pretrial releasees must suffer certain burdens that ordinary citizens do not, such as the requirement that they "seek formal permission from the court . . . before . . . travel[ing] outside the jurisdiction." Dissent at 6484. These requirements, however, are unquestionably related to the government's special need to ensure that the defendant not abscond. *See* page 6455 *supra*. Whether the accused may be made to suffer other burdens that are *not* designed to ensure his appearance in court is the very question we are now considering.

[12]We do not hold that the government can *never* justify drug-testing as a condition of pre-trial release. Such a condition may well be justified based on a legislative finding, *see, e.g.*, note 8 *supra*, or an individualized finding that defendant's ability to appear in court will be impaired absent drug-testing. Any unpublished dispositions of our court construing *Scott* as containing a categorical prohibition on drug-testing bail conditions are not precedential, *see* 9th Cir. R. 36-3, and are, in any event, superseded by this amended opinion.

[13]We do not decide what types of individualized and/or legislative findings might satisfy a special needs showing; whatever is required, the government did not accomplish it in this case.

We thus cannot validate Scott's search under the special needs doctrine.

**[14] 3.** Nor was the search reasonable under a more general "totality of the circumstances" approach. Scott's position was in some ways similar to that of the probationer whose reasonable-suspicion search was upheld on this theory in *United States* v. *Knights*, 534 U.S. 112 (2001). But in upholding that search, the Supreme Court stressed Knights's status as a probationer:

> [T]he reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Knights' status as a probationer subject to a search condition informs both sides of that balance.

*Id.* at 118-19 (quoting *Wyoming* v. *Houghton*, 526 U.S. 295, 300 (1999)). The reasoning from *Griffin* was thus prominently on display in *Knights*. On the privacy side, probationers have sharply reduced liberty and privacy interests: Probation is a form of criminal punishment, so "probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' " *Id.* at 119 (quoting *Griffin*, 483 U.S. at 874 (quoting *Morrissey* v. *Brewer*, 408 U.S. 471, 480 (1972))). Though the *Knights* Court declined to address the consent rationale, *see id.* at 118; *see also* section 1 *supra*, it did reason that Knights's signature on a form purporting to authorize searches without a warrant or "reasonable cause" as a condition of probation, reduced his reasonable expectation of privacy, *id.* at 114, 119-20. The government, for its part, has an enhanced interest in surveillance and control because " 'the very assumption of . . . probation' is that the probationer 'is more likely than the ordinary citizen to violate the law,' " *id.* at 120 (quoting *Griffin*, 483 U.S. at 880), and probation is also concerned with reintegrating the probationer into the community, *see id.* at 120-21.

The dissent's inability to see a "constitutionally relevant" distinction, *see* dissent at 6481, between someone who has been convicted of a crime and someone who has been merely accused of a crime but is still presumed innocent, overlooks both common sense and our caselaw. Recently, in *Kincade*, a plurality of this court noted "the well-established principle that parolees and other conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public." 379 F.3d at 833 (plurality opinion). It stressed the "transformative changes wrought by a lawful conviction and accompanying term of conditional release," *id.* at 834, and the "severe and fundamental disruption in the relationship between the offender and society, along with the government's concomitantly greater interest in closely monitoring and supervising conditional releasees," occasioned by a conviction and imposition of release conditions, *id.* at 835.[14]

[15] For our purposes, the lesson of *Knights* and *Kincade* is the same as that of *Griffin*: Probationers are different. Like Knights, Scott had a reduced expectation of privacy because he had signed a form that, on its face, explicitly waived the warrant requirement and implicitly (through the use of the word "random") waived the probable cause requirement for drug testing. But Scott, far from being a post-conviction conditional releasee, was out on his own recognizance before trial. His privacy and liberty interests were far greater than a probationer's. Moreover, the assumption that Scott was more likely to commit crimes than other members of the public, without an individualized determination to that effect,[15] is

---

[14]It is no answer to point out, as does the dissent, that "individuals confined in prison pending trial have no greater privacy rights than other prisoners." Dissent at 6471. The ability of prison officials to search a pretrial detainee or his cell is justified by institutional needs such as prison security and escape prevention. *See Hudson* v. *Palmer*, 468 U.S. 517, 529 (1984). These justifications are inapplicable when a defendant is awaiting trial outside of a detention facility.

[15]Prior convictions and other reliably determined facts relating to dangerousness may be relevant to such a determination, but the mere fact that the defendant is charged with a crime cannot be used as a basis for a determination of dangerousness.

contradicted by the presumption of innocence: That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.

**[16]** While the Supreme Court has upheld the constitutionality of pre-trial detention on grounds of dangerousness, the Court stressed that the statute it was upholding contained important safeguards, including the requirements that defendant be accused of a particularly serious crime and that dangerousness be proved to a neutral judicial officer by clear and convincing evidence. *See Salerno*, 481 U.S. at 747, 750-52; *cf. United States* v. *Kills Enemy*, 3 F.3d 1201, 1203 (8th Cir. 1993) (contrasting pre-trial releasees with convicted persons awaiting sentence, and noting that the latter are "no longer entitled to a presumption of innocence or presumptively entitled to [their] freedom"). Neither *Salerno* nor any other case authorizes detaining someone in jail while awaiting trial, or the imposition of special bail conditions, based merely on the fact of arrest for a particular crime. To the contrary, *Salerno* was explicit about what must occur under the federal Bail Reform Act—beyond arrest—before a pre-trial criminal defendant could be detained: "In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Salerno*, 481 U.S. at 750. Thus, the Supreme Court upheld the constitutionality of a bail system where pre-trial defendants could be detained only if the need to detain them was demonstrated on an individualized basis. The arrest alone did not establish defendant's dangerousness; it merely triggered the ability to hold a hearing during which such a determination might be made. It follows that if a defendant is to be released subject to bail conditions that will help protect the community from the risk of crimes he might commit while on

bail, the conditions must be justified by a showing that defendant poses a heightened risk of misbehaving while on bail. The government cannot, as it is trying to do in this case, short-circuit the process by claiming that the arrest itself is sufficient to establish that the conditions are required.

Finally, the government has no concern with integrating people like Scott, who has never left the community, back into the community. The government's interests in surveillance and control as to a pre-trial releasee are thus considerably less than in the case of a probationer. A search of Scott or his house on anything less than probable cause is not supported by the totality of the circumstances in this case.

[17] **4.** Nevada's decision to test Scott for drugs without probable cause does not pass constitutional muster under any of the three approaches: consent, special needs or totality of the circumstances. Since the government concedes there was no probable cause to test Scott for drugs, Scott's drug test violated the Fourth Amendment. Probable cause to search Scott's house did not exist until the drug test came back positive. The validity of the house search, which led to both the shotgun and Scott's statement about the shotgun, is derivative of the initial drug test. That search is likewise invalid; its fruits must be suppressed.

\* \* \*

We **AFFIRM** the district court's order granting Scott's motion to suppress.

---

BYBEE, Circuit Judge, dissenting:

The majority holds that probable cause is required for the warrantless search of the person or home of a pretrial releasee even though the releasee agreed to the search as a condition

of his pretrial release. The majority reasons that, for Fourth Amendment purposes, we cannot distinguish between persons charged with a crime and those who are not. As the majority writes, "[t]hat an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody." Maj. op. at 6464. That conclusion is contrary to history, practice and commonsense; it carries monumental implications for the pretrial procedures employed by every state in our circuit, as well as the United States.

This is not only an issue of first impression in our circuit, it is an issue of first impression in any federal court. While the question is one of first impression, we are not without guidance. There is a body of jurisprudence — both state and federal — examining the status of probationers, parolees, and presentence and pretrial releasees. Based on my reading of the cases, I cannot agree with the majority's new *per se* rule. If the "touchstone of our analysis under the Fourth Amendment is always 'the *reasonableness* in all the circumstances of the particular governmental invasion[,]' " then an individualized inquiry must be undertaken to determine if the particular condition imposed is, in fact, "reasonable." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (emphasis added).

Accordingly, I would resolve this case by specifically examining the facts and circumstances applicable to Scott's pre-trial release, then weighing the legitimate interests of the state against the individual privacy interests at stake. Under this approach — a familiar approach employed for warrantless searches of probationers, parolees, and presentence releasees — I do not believe that probable cause was necessary to search Scott's person for drugs. Once obtained, the positive drug test result gave rise to probable cause to search Scott's living room. I respectfully dissent.

## I.  FACTS AND PROCEEDINGS BELOW

The individualized inquiry that I find necessary calls for a fuller development of the facts than that proffered by the majority. Raymond Lee Scott was charged in Douglas County, Nevada with one felony and two misdemeanors related to the possession of methamphetamine and drug paraphernalia. Two days later, Scott was released on his own recognizance ("OR"), subject to his consent to several conditions of pre-trial release.

On a printed release form, the Nevada court checked some, but not all, of the conditions on the form. Scott agreed to submit to "random drug and alcohol testing, anytime of the day or night by any peace officer without a warrant"; and to submit himself, his residence and his vehicle "to search and seizure by any peace officer anytime day or night without a warrant for C/S [controlled substances and] ALCOHOL." He also promised not to "carry or possess any firearms or dangerous weapons[.]" Finally, Scott's release form provided that "[a]ny law enforcement officer having probable cause to believe the named defendant has violated a condition of this release is ordered to arrest the person."[1]

Shortly after his release, Douglas Swalm, a probation officer working for the Department of Alternative Sentencing, received information that Scott had in his possession a 9mm handgun, a sawed off shotgun and paraphernalia specific to the manufacture of methamphetamine. Based on this information, and without obtaining a warrant, Swalm conducted a "compliance visit" at Scott's residence, accompanied by probation officer Nathan Almeida and several sheriff's deputies

---

[1]The Nevada court tailored Scott's bail conditions. The OR form is pre-printed with twelve conditions, each one having a box in front of it that may be checked. The court checked eight of the twelve boxes, making a hand-written notation on one limiting warrantless searches of Scott, his residence or vehicle to searches for controlled substances and alcohol.

and narcotics agents. Upon their arrival, Scott invited the officers inside, where Almeida administered a urine drug test that indicated that Scott had been using methamphetamine. Scott was then handcuffed, seated on a couch in his living room, told that the officers were going to search his residence, and questioned as to whether there were any weapons in the house. Scott denied having any firearms, but admitted to having "several toy guns that his children used to play Cowboys and Indians with."

Later, Almeida asked Scott where the "toy guns" were. Scott gestured to the television set across the room, where Almeida spotted a nylon holster that appeared to have a gun in it with both the grip and the barrel protruding from the holster. Almeida testified that once Scott pointed out the gun, he could recognize it immediately. The holster contained a sawed-off .410 gauge shotgun. The officers also found a box of shotgun shells adjacent to the television.

Based on the results of the search, a grand jury charged Scott with possessing a shotgun in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. Scott moved to suppress the shotgun and the statements he made during the search. The government conceded that the search was not supported by probable cause, but argued that Swalm reasonably suspected that Scott was in violation of the conditions of his release.

The district court granted Scott's motion to suppress. Balancing Scott's privacy interests against the "legitimate interests of the state in light of the totality of the circumstances," the district court concluded that probable cause was needed to search Scott's home. *United States v. Scott*, CR-N-03-0122-DWH, Order (D. Nev., Jan. 26, 2004) (citing *United States v. Knights*, 534 U.S. 112, 118-19 (2001)). Finding no probable cause, the court held the search unreasonable in violation of the Fourth Amendment. The government timely appealed to this court.

## II.   STANDARD FOR WARRANTLESS SEARCH OF PRETRIAL RELEASEE

Scott contends that the district court properly determined that probable cause, rather than reasonable suspicion, was necessary to justify the search of his home. The government maintains that reasonable suspicion is the only standard applicable to pretrial releasees, and that such suspicion was satisfied in this case.

Although the question is one of first impression, we do not write on a clean slate. Accordingly, a detailed examination of the body of Fourth Amendment case law exploring the status of individuals with diminished liberty interests is useful to understanding the precise nature of the liberty interests under scrutiny here.

A.   *Fourth   Amendment   Status   of   Individuals   with Diminished Liberty Interests*

   1.   Probationers, Parolees, and Presentence and Pretrial Releasees

Courts have distinguished the liberty interests of individuals on probation and parole from ordinary citizens who have not been convicted of any crime. Warrantless searches that would not meet constitutional standards if other persons were the targets often meet constitutional muster when the target of the search is a parolee or probationer. *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 259 (9th Cir. 1975). We have held that warrantless searches of parolees and probationers are acceptable provided that they are conducted pursuant to the terms of the probation, *United States v. Richardson*, 849 F.2d 439 (9th Cir. 1988), or they are conducted to advance the goals of the individual's probation, rather than merely for the purposes of investigation, *United States v. Ooley*, 116 F.3d 370, 372 (9th Cir. 1997). Probationers and parolees' homes are often searched without a warrant or prob-

able cause. *See, e.g., United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002) (allowing search of parolee's home based on reasonable suspicion); *Owens v. Kelley*, 681 F.2d 1362 (11th Cir. 1982) (upholding probation condition stating that defendant convicted of drug possession must submit to search of his home at any time whenever requested by a probation officer); *Latta v. Fitzharris*, 521 F.2d 246, 250 (9th Cir. 1975) ("the parolee and his home are subject to search by the parole officer when the officer reasonably believes that such search is necessary in the performance of his duties"); *People v. Reyes*, 968 P.2d 445 (Cal. 1998) (upholding search condition as it applied to parolee); WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.10 (4th ed. 2004).

Similarly, courts have determined that individuals who have been convicted of crimes but remain free on bond or OR pending sentencing have a diminished expectation of privacy as compared to ordinary citizens. Courts have determined that probable cause is not necessary to search the homes of convicts released presentencing. In *State v. Fisher*, 35 P.3d 366 (Wash. 2001), the Washington Supreme Court held that although probable cause is normally required for issuance of a warrant, convicts released pending sentencing may be arrested on the basis of a "reasonable grounds" standard. The court distinguished the "due process rights of an accused [from those of] a defendant who has already been adjudged 'guilty[.]' " *Id.* at 375. The court further pointed out that:

> Both circumstances raise different expectations of privacy and levels of constitutional protections. An accused's liberty is subject to restraint through an arrest and the jurisdiction of the courts. A convicted and sentenced felon is subject to the jurisdiction of the Department of Corrections. A convicted felon who awaits sentencing is still subject to the court's jurisdiction, but yet does not possess the same constitutional rights as one merely accused. . . . Accord-

ingly, [the defendant's] rights must be analyzed not from the status of an accused person, but from her status as a *convicted felon released on personal recognizance and awaiting sentencing*.

*Id.* at 375-76 (emphasis in original). Other courts have similarly observed that individuals released after conviction, but not yet on probation or parole, have a "reduced expectation of privacy[,]" and thus, "the police needed only a reasonable basis to conduct a warrantless search of their home." *See State v. Anderson*, 95 P.3d 635, 638 (Idaho 2004).

We have drawn this same distinction. In *Portillo v. U.S. Dist. Court for the Dist. of Ariz.*, 15 F.3d 819, 823-24 (9th Cir. 1994), we held that the supervisory nature of postconviction, presentence release is a "special need" justifying drug tests on the basis of reasonable suspicion rather than probable cause. In balancing the defendant's privacy interests against the state's supervisory interests, the court specifically considered the fact that the defendant "[had] been convicted of theft and [was] awaiting sentencing." *Id.*

A few courts have considered the Fourth Amendment status of individuals, like Scott, who have been released pretrial on bail or on their own recognizance. We have commented only briefly on the status of pretrial releasees. In *United States v. Kills Enemy*, 3 F.3d 1201 (9th Cir. 1993), we contrasted an individual on pretrial release with a convicted person awaiting sentence in that the latter "is no longer entitled to a presumption of innocence or presumptively entitled to his freedom." *Id.* at 1203. And, in *Cruz v. Kauai County*, 279 F.3d 1064 (9th Cir. 2002), we observed that "one who has been released on pretrial bail does not lose his or her Fourth Amendment right to be free of unreasonable seizures." *Id.* at 1068.

In contrast, individuals confined in prison pending trial have no greater privacy rights than other prisoners. *Bell v. Wolfish*, 441 U.S. 520 (1979) (treating pretrial detainees the

same as prisoners convicted of an offense); WILLIAM E. RINGEL, SEARCHES AND SEIZURES, ARRESTS AND CONFESSIONS § 17:9 (2005). Thus, a search of a pretrial detainee's cell, *Soldal v. Cook County*, 506 U.S. 56, 65 (1992); *Hudson v. Palmer*, 468 U.S. 517 (1984), as well as the random monitoring and recording of a pre-trial detainee's telephone conversations on a prison telephone have not been held to violate the Fourth Amendment. *See United States v. Willoughby*, 860 F.2d 15 (2d Cir. 1988).

Although pretrial releasees may not lose their Fourth Amendment rights, until today's decision we have not squarely addressed whether pretrial releasees have diminished Fourth Amendment rights. Specifically, does a search of a pretrial releasee require probable cause? But the question has been addressed by state courts. Each has determined that warrantless search conditions may be imposed on a pretrial releasee so long as those conditions are reasonable. *See, e.g.*, *State v. Ullring*, 741 A.2d 1065, 1069 n.3, 1073 (Me. 1999); *In re York*, 892 P.2d 804 (Cal. 1995).

The leading case is *In re York*, where the California Supreme Court determined that a state statute requiring compliance with "reasonable conditions" on pretrial release allowed for warrantless searches and random drug testing. Unable to post the bail prescribed for their offenses, the petitioners in *York* were given the choice of remaining in custody pending trial upon the charges or obtaining OR release. To obtain OR release, they had to agree to specified conditions, including a requirement that they "[s]ubmit to drug [and, in some instances, alcohol] testing" and "[p]ermit search and seizure of his/her person, residence, and vehicle by any peace officer without a search warrant." *Id.* at 806.

Petitioners argued that the imposition of warrantless drug testing and search conditions upon OR releasees violated the Fourth Amendment. *Id.* The court rejected this claim for two

reasons. The court first pointed out that defendants released on OR lack

> the same reasonable expectation of privacy as that enjoyed by persons not charged with any crime, and by defendants who have posted reasonable bail. Unlike persons in these latter categories, however, a defendant who is unable to post reasonable bail has no constitutional right to be free from confinement prior to trial and therefore lacks the reasonable expectation of privacy possessed by a person unfettered by such confinement. Because an incarcerated individual generally is subject to random drug testing and warrantless search and seizure in the interest of prison security, the conditions challenged in the present case do not place greater restrictions upon an OR releasee's privacy rights than the releasee would have experienced had he or she not secured OR release. Viewed from this perspective, the challenged conditions do not require an OR releasee to "waive" Fourth Amendment rights that he or she would have retained had OR release been denied. Instead, the conditions simply define the degree of liberty that the court or magistrate, in his or her discretion, has determined to grant to the OR releasee.

*Id.* at 813. Second, the court stated that the conditions are not unconstitutional because "a pretrial detainee is not required to agree to such restrictions, but rather is subject to them only if he or she consents to their imposition, in exchange for obtaining OR release." *Id.* at 814. The court reasoned that "one who otherwise would be incarcerated prior to judgment [because he cannot post bail] is offered the opportunity to obtain OR release[;] he or she is not entitled to unconditional bail-free release, but may obtain OR release only in the discretion of the court or magistrate, and only upon those reasonable conditions attached to the release." *Id.* at 814. Recognizing that such restrictions are not unlimited, the court pointed out that

the conditions must be "reasonable under the circumstances," which in turn depends on "the relationship of the condition to the crime or crimes with which the defendant is charged and to the defendant's background, including his or her prior criminal conduct." *Id.* at 815 n.10. The court then held the search and drug testing conditions reasonable under the circumstances because they "clearly relate to the prevention and detection of further crime and thus to the safety of the public." *Id.* at 810. Accordingly, the court concluded that warrantless searches and random drug testing did not violate petitioners' Fourth Amendment rights.

In *State v. Ullring*, 741 A.2d 1065 (Me. 1999), the Supreme Court of Maine reached the same decision, concluding that probable cause is not required to search the home of a pretrial releasee. In *Ullring*, a defendant was arrested for possessing marijuana and other drug paraphernalia. *Id.* at 1066. He posted bail and signed a bail bond requiring "him to submit to random searches of his person, residence, and vehicle." *Id.* After a warrantless search of his home uncovered marijuana, the defendant challenged the trial court's denial of his motion to suppress the evidence. The court began by considering the objectives of the bail system in Maine, observing that its purpose is "to ensure the appearance of the defendant at trial and to do so without incarceration as long as conditions can be imposed which will fulfill that purpose and the purpose of ensuring the integrity of the judicial process." *Id.* at 1072. The court reasoned that

> [b]ail conditions, such as a prohibition against possession of illegal drugs and searches for illegal drugs, help to ensure that defendants whose backgrounds and charges indicate that substance abuse is a significant problem will show up at court. It is reasonable to expect that a defendant who maintains sobriety is more likely to appear in court on the appointed dates than a defendant who is under the influence of drugs or alcohol.

*Id.* at 1072-73. The court concluded that the random search condition was constitutional because the condition was reasonable as applied to the "history and personal situation of the defendant." *Id.* at 1073.[2] For support, the court appealed to the Supreme Court's seminal decisions in *Griffin* and *Knights*.

In *Griffin*, the Court upheld a Wisconsin law that permitted a probation officer to search a probationer's home without a warrant as long as his supervisor approved and as long as there were "reasonable grounds" to believe that contraband was present. *Griffin*, 483 U.S. at 870-71. Based on a tip, a probation officer searched Griffin's home and found a firearm. Griffin was then charged with being a felon in possession of a firearm. *Id.* at 872. The Wisconsin Supreme Court had previously announced a *per se* rule that "a probation officer may, consistent with the Fourth Amendment, search a probationer's home without a warrant, and with only 'reasonable grounds' (not probable cause) to believe that contraband is present." *Id.* at 872. The Court held that it was "unnecessary to embrace a new principle of law . . . that *any* search of a probationer's home by a probation officer satisfies the Fourth Amendment as long as the information possessed by the officer satisfies a federal 'reasonable grounds' standard," but it was enough to say that "*this* warrantless search did not violate the Fourth Amendment." *Id.* (emphasis added). The court

---

[2]Likewise, other courts interpreting pretrial release and bail statutes have inquired into the defendant's particular circumstances before upholding warrantless search and drug testing requirements. *See Oliver v. United States*, 682 A.2d 186 (D.C. App. 1996) (declining to determine whether the testing requirement may only be imposed when there is an individualized determination in all cases, but finding a "clear basis" for imposing a drug testing requirement on defendant); *Steiner v. State*, 763 N.E.2d 1024, 1027-28 (Ind. App. 2002) ("the trial court must make an individualized determination that the accused is likely to use drugs while on bail before it is reasonable to place restrictions on the individual based on that contingency"). *See also Harvey v. State*, 751 N.E.2d 254 (Ind. App. 2001) (pretrial releasee who was charged with the sale of drugs could be ordered to submit to random drug tests as condition of bail).

concluded that "the search of Griffin's home satisfied the demands of the Fourth Amendment because it fulfilled a "special need[, which] make the warrant and probable-cause requirement impracticable." *Id.* (citing *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)).

The Court reexamined the issue in *Knights*, and held that a warrantless search of a probationer's apartment was reasonable under the Fourth Amendment where it was authorized by a condition of his probation and supported by reasonable suspicion. *Knights*, 534 U.S. at 122. After obtaining probation for a misdemeanor drug offense, Knights signed a condition that he would "[s]ubmit his . . . person, property place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114. While Knights was on probation, a police officer conducted an investigatory search of his home and found materials indicating that he participated in a conspiracy to commit arson. *Id.* at 116.

Knights argued that "a warrantless search of a probationer satisfies the Fourth Amendment only if it is . . . 'a special needs' search conducted by a probation officer." *Id.* at 117. The Court rejected this rationale, again emphasizing that *Griffin* did not decide that *all* warrantless searches of probationers were reasonable within the meaning of the Fourth Amendment. *Id.* at 117-18. Instead, the Court relied on a "general Fourth Amendment approach of 'examining the totality of the circumstances,' *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), with the probation search condition being a salient circumstance." *Knights*, 534 U.S. at 118. *See also United States v. Stokes*, 292 F.3d 964, 967-68 (9th Cir. 2002). This approach consisted of "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 119 (citing *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The probation order "clearly

expressed the search condition and Knights was unambiguously informed of it." *Id.* at 119. "The probation condition thus significantly diminished Knights' reasonable expectation of privacy." *Id.* The Court also recognized the state's concern in preventing a probationer from engaging in further criminal activities. *Id.* at 120-21. Because the state may "justifiably focus on probationers in a way that it does not on the ordinary citizen," reasonable suspicion rather than probable cause may justify a warrantless search. *Id.* at 121.

## 2. Totality of the Circumstances

Although the majority cites *Griffin* and *Knights*, it does not consider the various factors that are relevant in determining whether the search of Scott's home and person were reasonable. In my view, a balancing approach that incorporates those factors is appropriate here. Toward this end, I consider the state's interests, which include the purposes of the OR release and bail system in Nevada, state law standards relating to eligibility for pretrial release, and specific concerns applicable to Scott's pre-trial release, taking into account the crime with which he was charged and the conditions to which he consented.

The imposition of pretrial search conditions must be adapted to the pretrial releasee; the conditions should be related to a public purpose such as rehabilitating the offender or protecting the public. *See, e.g., Owens*, 681 F.2d at 1366-67; *Consuelo-Gonzales*, 521 F.2d at 263. Even as I question the "categorical no" approach adopted by the majority, I would not endeavor to create a one-size-fits-all standard for approving all searches of pretrial releasees; this approach was rejected by the Court in *Griffin* with respect to probationers and it is equally ill-suited to pretrial releasees.

Finally, although the balancing test offered by the Court in *Knights* seems to invite a series of finely tailored standards, lower federal courts are *not* free to insert new standards into

the gap between reasonable suspicion and probable cause. *United States v. Montoya de Hernandez*, 473 U.S. 531, 540-41 (1985) (rejecting an intermediate "clear indication" standard as incompatible with the Fourth Amendment's "reasonableness" approach). Thus, recognizing "reasonableness" as the hallmark of the Fourth Amendment, I apply the standards announced in *Knights*, balancing Scott's privacy interests against the legitimate interests of the state in light of the totality of the circumstances. *Knights*, 534 U.S. at 118-19.

B. *Fourth Amendment Balancing*

In accord with the Court's analysis in *Griffin*, I turn to an examination of the standards applied by Nevada courts in releasing Scott on his own recognizance.[3] While "the validity of a search conducted by state law enforcement officers is ultimately a question of federal law," federal courts "must look to state law to determine the validity of the underlying [release] condition itself, and may consider state precedent for its persuasive value[.]" *Ooley*, 116 F.3d at 372 (internal citations and quotations omitted). Before releasing a person without bail,[4] a Nevada "court may impose such reasonable conditions on the person as it deems necessary to protect the health, safety and welfare of the community to ensure that the person will appear at all times and places ordered by the court . . ." Nev. Rev. Stat. § 178.484(8).[5] Although the Nevada

---

[3]While Nevada courts for many years have applied a "reasonable suspicion" standard to probationary searches, *Allan v. State*, 746 P.2d 138 (1987); *Seim v. State*, 590 P.2d 1152 (1979) ("To justify a warrantless search by a parole or probation officer, the officer must have reasonable grounds to believe that a violation of the parole or probation has occurred."), it is not clear if Nevada intends to apply that same standard to searches of pretrial releasees, although it seems likely.

[4]Under Nevada law, any person "arrested for an offense other than murder of the first degree must be admitted to bail." Nev. Rev. Stat. § 178.484(1).

[5]Nevada's standard is quite similar to the federal standard for release of a defendant pending trial. *See* 18 U.S.C. § 3142(c)(B). *See also Griffin*, 483 U.S. at 875.

statutes do not specifically mention warrantless searches or random drug testing, the list is expressly nonexclusive. *Id.*

1.   The State's Interests

a.   *Protecting the public.* The majority rejects the state's interest in protecting the public as a "quintessential general law enforcement purpose [which is] the exact opposite of a special need," and argues that the presumption of innocence insulates the pretrial releasee from the claim that he is "more likely to commit crimes than other members of the public." Maj. op. at 6457, 6463. First, the state's interest is not so easily dismissed by referring to the state's general duty to protect the public or the presumption of innocence. The Court has rejected a similar argument in *Knights* that warrantless searches of probationers must serve a "special need," 534 U.S. at 117, and not a more general purpose. Moreover, while protecting its citizens is the first duty of government, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), Nevada's concern for the safety of the public is not "general law enforcement" when it is manifested in pretrial conditions tailored to this defendant.

Second, the accused enjoys the presumption of innocence as a *trial* right; an accused does not enjoy the same presumption with respect to ordinary civil rights of citizens, such as freedom of movement. *See, e.g.*, U.S. CONST. amend. VIII ("*Excessive* bail shall not be required"; emphasis added).[6]

---

[6]I do not see the relevance of the majority's assertion that under the Excessive Bail Clause of the Eighth Amendment, "[t]here may . . . be cases where the risk of flight is so slight that any amount of bail is excessive; release on one's own recognizance would then be constitutionally required, which could further limit the government's discretion to fashion the conditions of release." Maj. op. at 6450 n.5. I do not read the majority opinion to hold that Scott is within the class of persons for whom "any amount of bail" (or any pretrial conditions) would be excessive under the Eighth Amendment. *See United States v. Smith*, 444 F.2d 61 (9th Cir. 1971) (holding that pretrial conditions of release under 18 U.S.C. § 3142 do not violate the Eighth Amendment). The footnote is both dicta and, under the approach I have advocated, irrelevant.

Both courts and Congress have implicitly rejected the majority's argument by treating persons indicted for crimes differently than ordinary citizens. In *Wolfish*, the Supreme Court rejected a similar argument, concluding that "[t]he presumption of innocence is a doctrine that allocates the burden of proof in criminal trials . . . [b]ut it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun." 441 U.S. at 533. Likewise, in *Speight v. United States*, 569 A.2d 124 (D.C. Ct. App. 1989), the court held that a local statute that punished crimes committed while on pretrial release greater than those committed by ordinary citizens did not violate the presumption of innocence. *See also* 18 U.S.C. § 922(n) (specifically punishing *indicted* persons who receive or ship firearms in interstate commerce); *United States v. Craven*, 478 F.2d 1329, 1340 (6th Cir. 1973) (rejecting claims that the statutory classification punishing indicted persons is irrational on the ground that, in treating indicted persons differently, it "adversely affect[s] the presumption of innocence[ ]"; stating that the classification is valid since Congress's conclusion that the fact of a felony indictment is "so often indicative of a propensity for violence" is "eminently reasonable"); *United States v. Brown*, 484 F.2d 418, 424 (5th Cir. 1973) (same); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971) (same). Cf. 18 U.S.C. § 3577 (approving of consideration of prior arrests in imposing penalties by providing that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate penalty"). Individuals on pretrial release may be treated differently than ordinary citizens without violating the presumption of innocence.

The majority's lack of consideration for the state's expressed interests is especially irresponsible in cases involving "drugs or illegal weapons" where authorities supervising the convict "must be able to act based on a lesser degree of

certainty than the Fourth Amendment would otherwise require in order to intervene before [the person] does damage to himself or society." *Griffin*, 483 U.S. at 879; *see Kills Enemy*, 3 F.3d at 1203; *State v. Anderson*, 95 P.3d 635, 638 (Idaho 2004) ("Because [Defendant's] convictions were for drug crimes, a heightened need of supervision was necessary to protect them and society"; thus, "the [Defendant's] convictions and past drug history, combined with the rumors and reports . . . of . . . police and [their] neighbor are sufficient to establish reasonable grounds for the search.").

Scott's status as a pre-trial releasee distinguishes him from the probationer considered in *Griffin*, but the distinction is not constitutionally relevant. The Court's analysis in *Griffin* and *Knights* should apply equally to the facts of this case. Scott was arrested for felony drug possession, and the probation officers searched his home based on reasonable suspicion that he possessed firearms and drug paraphernalia. Perhaps the state has a lesser interest where conviction has not yet been established, but surely the state retained some interest in intervening before Scott did "damage to himself or society." *Griffin*, 483 U.S. at 879.

Moreover, "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987). *See also Speight*, 569 A.2d at 126-27 (discussing Congress's concern with the increase in crimes committed during pretrial release). The majority acknowledges that protecting the community is a compelling interest, but dismisses it as a rationale because "crime prevention is a quintessential general law enforcement purpose and therefore is the exact opposite of a special need." Maj. op. at 6457. The majority's point might be well taken if the courts were authorizing random searches of the general population. But they are not. What Nevada authorized was a search of Raymond Lee Scott, who Nevada had charged with violating the drug laws. Nevada could have incarcerated Scott pending trial to prevent further criminal activity or, as it chose

here, it could release Scott on OR and require him to submit to drug testing and search for prohibited substances. Both of those choices are clearly related to Nevada's interest in preventing "more criminal activity by him after he is released." NEV. REV. STAT. § 178.4853(9). By failing to recognize these interests, the majority grossly misrepresents the government's interest in protecting the public through supervising individuals on pretrial release.

b.   *Securing attendance at trial.* With regard to Nevada's second articulated interest, ensuring that the defendant appears in court, the majority hypothesizes that the state is concerned that a defendant "who uses drugs while on pre-trial release could be so overcome by the experience that he misses his court date" or "may be too mentally impaired to participate meaningfully in the proceedings." Maj. op. at 6458. The majority concedes that these are "conceivable justifications," but asserts that the "government has produced nothing to suggest these problems are common enough to justify intruding on the privacy rights of every single defendant out on pre-trial release" and must do so "empirically." *Id.*

Thus, without explanation, the majority requires that state governments "empirically" prove that drug use is preventing individuals from appearing in court before they can require consent to drug testing in exchange for pretrial release. *See id.* There are other reasons a state might link drug testing with attendance at trial. Even if the state was not concerned with physical attendance, the state has a strong interest in preserving its judicial resources. Drug testing helps ensure that the accused is physically and mentally prepared for trial, so that there are no delays or claims that the defendant was unable to understand the proceedings or participate in his defense.

Even assuming that drug use does not generally affect a pretrial releasee's likelihood of appearing in court, the majority ignores the other state interests underlying the conditions. Although random drug tests "cannot be said to relate directly

to the likelihood that a defendant will comply with his or her duty to attend subsequent court hearings," the conditions "clearly relate to the prevention and detection of further crime and thus to the safety of the public." *In re York*, 892 P.2d at 810, 812. Requiring states to make an empirical showing before imposing a drug testing condition ties the hands of states in preventing crimes and protecting the public. Moreover, today's holding carries monumental implications for the numerous state governments that regularly require, where drug offenses are concerned, submission to drug testing in exchange for pretrial release.

### 2.   Scott's Interests

As to Scott's interest, the searches were conducted at Scott's home, a location specially protected by the Fourth Amendment. *See generally Kyllo v. United States*, 533 U.S. 27 (2001). No criminal judgment or sanction had been imposed on Scott at the time of the search. Further, at the time of arrest he was not carrying any dangerous weapons. Although all of these factors favor privacy protection, Scott's initial arrest was for felony possession of methamphetamine and two misdemeanors — possession of drugs and drug paraphernalia. Such drugs are frequently used or stored in the home. Thus, Scott's reasonable expectation of privacy may be somewhat greater than that of a probationer, parolee, or presentence releasee, but it is less than that of an "ordinary citizen." Moreover, Scott's reasonable expectation of privacy is diminished somewhat by his agreement to place himself under the supervision of the Department of Alternative Sentencing and waive the warrant requirement in exchange for being released on OR. The search condition itself, a "salient circumstance" in the Fourth Amendment balance, *Knights*, 534 U.S. at 118, allowed warrantless searches for controlled substances and alcohol, and implicitly waived the probable cause requirement by imposing "random" drug testing. The consent form "clearly expressed the search condition" and Scott was "unambiguously informed of it." *Id.* at 119. The conditions on the

form, to submit to random drug testing and warrantless searches of his home for alcohol and controlled substances, were also related to the felony and misdemeanor drug crimes with which he was charged. "The [release] condition thus significantly diminished [Scott's] reasonable expectation of privacy." *Id.*

In my view, the *Knights* balance tips more favorably in the direction of the state's legitimate interests as it concerns the random drug testing condition. Scott knowingly consented to random drug testing in exchange for release from prison pending trial. I would hold that the state did not violate the Constitution by requiring Scott to submit to a random drug test based on reasonable suspicion. Once the state administered the drug test, and it came back positive, the officers had probable cause to arrest Scott, search his living room, and question him as to the presence of any weapons on the premises. Thus, I would hold that the guns were obtained during a lawful search. I find the Court's decisions in *Griffin* and *Knights* instructive in this regard.

The majority attempts to distinguish *Griffin* by stating that "pre-trial releasees are not probationers," and "[p]eople released pending trial, by contrast, have suffered no judicial abridgment of their constitutional rights." Maj. op. at 6461 (footnote omitted). While technically I agree that pretrial releasees have not had a *judicial* abridgment of their constitutional rights, they have a lesser expectation of privacy than an ordinary citizen. A pretrial releasee suffers great burdens and is "scarcely at liberty[.]" *Albright v. Oliver*, 510 U.S. 266, 279 (1994) (Ginsburg, J., concurring). A person facing pending charges and released on their own recognizance is "required to appear in court at the state's command[,] . . . is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction." *Id.* at 278. A defendant who could not post bail or obtain release on OR faces a much

larger deprivation of liberty by being confined pending trial. "Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Detention may limit a defendant's preparation for trial by limiting his access to his attorney and potential witnesses. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). It may also "result in permanent stigma and loss of reputation to the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1414 (9th Cir. 1985) (Boochever, J., concurring and dissenting in part). As Judge Boochever explained

> The magnitude of these concerns is increased by the fact that the injuries consequent upon pretrial confinement may not be reparable upon a subsequent acquittal. Society has no mechanism to recompense an individual for income lost or damages to a career due to pretrial confinement. Nor do we compensate the individual and his family for their mental suffering and loss of reputation due to pretrial incarceration.

*Id.* Further, "his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense." *Id.* Moreover, a defendant released on his own recognizance, even though he has not been charged with a crime, is considered to be "in custody" for some purposes. *Hensley v. Municipal Ct.*, 411 U.S. 345 (1973) (pretrial releasee is considered in custody for habeas purposes); *In re Floyd*, 413 F. Supp. 574, 576 (D. Nev. 1976) (recognizing that a defendant released on OR, but who has not been convicted and sentenced, is also considered to be "in custody").

Importantly, the common law seems to have regarded the difference between pretrial incarceration, bail, and other ways to secure a defendant's court attendance as different "methods of retaining control over a defendant's person[,] which was in

custody." *Albright*, 510 U.S. at 277-78 (Ginsburg, J., concurring) (citing 2 M. HALE, PLEAS OF THE CROWN 124 ("he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers"); 4 W. BLACKSTONE, COMMENTARIES 297 (bail in both civil and criminal cases is "a delivery or bailment, of a person to his sureties, . . . he being supposed to continue in their friendly custody, instead of going to gaol [jail].")). Thus, those complying with release conditions are able to forgo a deprivation of liberty much greater than any release condition.

This is not to say that all release conditions should be deemed constitutional. In fact, there have been several instances where courts have found release conditions too constrictive on liberty. *See Evans v. Ball*, 168 F.3d 856, 860-61 (5th Cir. 1999) (holding that a combination of pretrial release restrictions, including restriction on the amount of interstate travel, violate the Fourth Amendment), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003); *Gallo v. City of Phila.*, 161 F.3d 217, 224-25 (3d Cir. 1998) (same); *Murphy v. Lynn*, 118 F.3d 938, 942, 946 (2d Cir. 1997) (same)); *but see Karam v. City of Burbank*, 352 F.3d 1188 (9th Cir. 2003) (holding that the conditions of defendant's "OR release—requiring that she obtain permission of the court before leaving the state and that she make court appearances—[did not] amount[ ] to a seizure under the Fourth Amendment[ ]"). However, individuals charged with a crime and released before trial are not like ordinary citizens. While "[p]re-trial releasees are not probationers," they are separated from confinement only by a few hundred dollars or a signature on a consent form. Maj. op. at 6460.

This last point requires closer examination of the implications of the majority's ruling. The majority treats Scott's assent to the conditions of his OR release as a question of whether the Fourth Amendment permits Scott to waive his Fourth Amendment rights. This seems quite backwards to me.[7]

---

[7]The majority describes my use of the term "waiver" as "mistaken[ ]" and says "[t]he question here is whether the government can *induce* Scott

It seems to me that at the time Scott agreed to these conditions in exchange for release on OR he was in a much better position than we are to weigh the reasonableness of the government's proposed course of conduct. Unless we can find some irreducible right or moral imperative within the Fourth Amendment, one that absolutely forbids pretrial detainees from agreeing to *any* conditions before they are released, the majority's approach begs the question.

There are, of course, constitutionally irreducible rights— the right not to be a slave being the prime example. The Court has also suggested that government may not condition the receipt of government largesse, license, or privilege on the waiver of certain rights guaranteed by the Constitution, at least where the condition bears no plausible relationship to the receipt of the benefit. The receipt of a tax exemption cannot be conditioned, for example, on an express waiver of the privilege of criticizing the government. *See, e.g., Speiser v. Randall*, 357 U.S. 513, 518-19 (1958) ("To deny [a tax] exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech [and] necessarily will have the effect of coercing the claimants to refrain from the proscribed speech."). But no one has ever suggested that the rights of security and privacy in our "per-

to waive his Fourth Amendment rights." Maj. op. at 6449 n.4. The majority admits that the "government is under no duty to grant" Scott pretrial release. *Id.* at 6450. I do not see anything unconstitutional about "inducing" Scott to give up one freedom — his immunity from certain searches and seizures — in exchange for the freedom to walk the streets and sleep at home. Scott has just as surely been "induced" by the alternative: that the government will require bail or even jail him pending trial.

In one sense, the government has no more "induced" Scott to forgo his Fourth Amendment rights in exchange for his liberty, than Scott has "induced" the government to forgo its right to require bail in exchange for the right to search him at his home. The question is not inducement or not — although, ultimately, that is the way the majority treats the question — but whether the inducement is reasonable.

sons, houses, papers, and effects" cannot be infringed by statute or waived by agreement, at least when the infringement is related in some rational way to changes in the individual's legal status. *Griffin* and *Knights* are conclusive evidence to the contrary. *See also Wyman v. James*, 400 U.S. 309, 326 (1971) (holding that a state that conditioned payments under its Aid to Families with Dependent Children (AFDC) program on the "recipient's submission to warrantless searches of her home" did not unconstitutionally burden Fourth Amendment freedoms). I am not suggesting that there are no limits to what the government may demand from an OR releasee; I would hold in this case that the conditions Nevada exacted are not unreasonable.

The majority opinion may free Scott from the consequences of the state's discovery of a sawed-off shotgun in his home, but in the end today's opinion is not a liberty-enhancing decision. As the majority acknowledges, "[m]any pre-trial detainees willingly consent to such conditions, preferring to give up some rights in order to sleep in their own beds while awaiting trial." Maj. op. at 6450. Today's decision strikes down Nevada's practice of offering pretrial detainees the option of being released on OR and sleeping in their own beds in exchange for agreeing to a limited number of conditions that the state believes will protect the public and secure the attendance of the accused at trial. But the implications of the majority's new *per se* rule could hardly be more severe or far-reaching.

Every state in this circuit has a rule, similar to Nevada's, granting state judges broad discretion in the fashioning of pretrial release conditions. *See, e.g.*, ALASKA STAT. § 12.30.020(b)(7)-(c) (permitting courts to "impose any other condition considered reasonably necessary to assure the defendant's appearance as required and the safety of the alleged victim, other persons, or the community", and setting forth eleven factors the judge should take into account when fashioning conditions); ARIZ. RULES CRIM. PROC., Rule

7.3(b)(4) (providing for pre-trial release subject to "[a]ny other condition . . . which the court deems reasonably necessary"); CAL. PENAL CODE § 1318(a)(2) (requiring a "defendant's promise to obey all reasonable conditions imposed by the court or magistrate" before he can be released on his own recognizance); HAW REV. STAT. § 804-7.1(9) (permitting court to require, as a condition of OR release, that the defendant "satisfy any other condition reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person or community"); IDAHO CRIM. RULES, Rule 46(c) (allowing court to "impose such reasonable terms, conditions and prohibitions as the court finds necessary in the exercise of its discretion"); MONTANA STAT. 46-9-108(1) ("The court may impose any condition that will reasonably ensure the appearance of the defendant as required or that will ensure the safety of any person or the community . . . ."); NEV. REV. STAT. § 178.484(8) (permitting trial courts to "impose such reasonable conditions on the person as it deems necessary to protect the health, safety and welfare of the community to ensure that the person will appear at all times and places ordered by the court . . ."); OR. REV. STAT. § 135.260(1)(d) ("Conditional release may include one or more of the following conditions . . . [a]ny other reasonable restriction designed to assure the defendant's appearance."); WASH. CR. R. 3.2(b)(7) (empowering state courts to "[i]mpose any condition other than detention deemed reasonably necessary to assure appearance as required"). Moreover, at least California has interpreted its rule to permit random drug testing and warrantless search conditions. *See In re York*, 892 P.2d at 815 (upholding a pre-trial condition requiring the defendant to submit to random drug testing and warrantless searches and seizures); *see also Ullring*, 741 A.2d at 1073 (concluding that a random search condition employed by trial courts in Maine did not offend the Constitution).

The United States likewise employs a rule similar to Nevada's, granting broad discretion where pre-trial releasees are concerned. *See* 18 U.S.C. § 3142(c)(1)(B)(xiv) (providing

for pretrial release subject to "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community"). Importantly, the standard pre-trial release form used by federal courts across the nation requires, as a condition of release, the defendant to "submit to any method of testing required by the pretrial services office or the supervising officer for determining whether the defendant is using a prohibited substance." 7 Fed. Proc. Forms § 20:110, *Order Setting Conditions of Release, Additional Conditions of Release* (AO 199B). The form continues: "Such methods may be used with *random frequency* and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing." *Id.* (emphasis added). The majority defers the question whether federal pretrial release conditions are constitutional, maj. op. at 6459 n.8, but its principles apply no less to the federal system than to Nevada and the other states in the circuit. The majority's decision invalidates the United States government's pre-trial release condition unless federal officers can first demonstrate probable cause to support the drug test.

We cannot predict with certainty how the states or the United States will respond to the majority's new *per se* rule prohibiting warrantless search conditions and random drug testing without probable cause. It is not hard to imagine that some jurisdictions will decide that releasing persons accused of crimes on OR without such conditions will not serve the public interest. They may respond by either insisting on bail or simply holding the accused pending trial. Those pre-trial detainees might well have "preferr[ed] to give up some rights in order to sleep in their own beds while awaiting trial," maj. op. at 6450, but, under the majority's decision, their Fourth Amendment rights will be secure while they rest in the county jail.[8]

---

[8]Justice Scalia has colorfully illustrated why it is "not true" that "a constitutional right is by its nature so much more important to the claimant than a statutory right":

I am confident that, working within the framework of *Griffin* and *Knights*, there is little danger that we will "[g]iv[e] the government free rein to grant conditional benefits . . . [and] abuse its power by attaching strings strategically, striking lopsided deals." Maj. op. at 6451. Nothing that I have said here would sanction such actions, and I do not see that Nevada has done so here.

## III. CONCLUSION

I would hold that cases involving pretrial releasees are subject to a balancing test that weighs the legitimate interests of the state against the individual privacy interests at stake in light of the unique circumstances and facts alleged. Using this approach, I conclude that the search and seizure conducted here were valid; the officers needed only reasonable suspicion to administer the drug test and, once administered, they had probable cause to arrest Scott and search his living room for weapons.

I respectfully dissent.

---

> An individual's contention that the Government has reneged upon a $100,000 debt owing under a contract is much more important to him—both financially and, I suspect, in the sense of injustice that he feels—than the same individual's claim that a particular federal licensing provision requiring a $100 license denies him equal protection of the laws . . . . A citizen would much rather have his statutory entitlement correctly acknowledged after a constitutionally inadequate hearing, than have it incorrectly denied after a proceeding that fulfills all the requirements of the Due Process Clause.

*Webster v. Doe*, 486 U.S. 592, 618 (1988) (Scalia, J., dissenting).

**Volume 2 of 2**

CALLAHAN, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, GOULD, TALLMAN, BYBEE, and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:

The panel majority holds that a person arrested for drug offenses may not as a condition of pretrial release consent to searches for drugs on the basis of reasonable suspicion rather than probable cause. The majority's groundbreaking opinion misconceives the reality of pretrial release and the applicable constitutional principles, and substantially undermines and seriously burdens pretrial-release proceedings in the nine states covered by our circuit. I cannot endorse this flawed approach.

The majority's opinion is built on two false pillars. First, the majority asserts that defendants released pending trial "have suffered no judicial abridgment of their constitutional rights." Am. Op. at 6461.[1] While one might quibble over whether there is a "judicial" abridgment, the reality is that there is an abridgment and a court is involved. When a person is arrested, his constitutional rights are naturally abridged; the arrest is followed by a judicial determination as to the extent to which his rights may be abridged. A court determines whether he is entitled to pretrial release or may be held without bail.

Second, the majority's opinion posits that the presumption of innocence is applicable to the determination concerning pretrial release. *Id.* at 6464. This is true only in the broad sense that all participants recognize that to obtain a conviction, the prosecution will have to overcome this presumption by proving guilt beyond a reasonable doubt. But the Supreme Court has held that the presumption plays *no role* in a trial

---

[1] All references to the majority's decision are to the majority's amended opinion filed contemporaneously with today's order denying the government's suggestion for rehearing en banc. In the same vein, all references to the dissent are to Judge Bybee's revised dissenting opinion.

court's determination of what conditions, if any, will permit a defendant's pretrial release. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). In other words, a trial court may presume the validity of the criminal charges against the defendant at this initial step in the criminal proceedings.

Once these misconceptions are realized, there is little weight to the majority's arguments for an elevated showing of special need or for holding that the defendant is constitutionally barred from consenting to a drug search on the basis of reasonable suspicion.

## I.

Nevada police arrested the defendant for possession of methamphetamine and drug paraphernalia. A few days later, he appeared before a state judge, who held a hearing and released the defendant on his own recognizance, subject to the defendant's consent to several conditions of pretrial release. On a preprinted release form, the state judge checked some of the conditions on the form, allowing for the warrantless testing of the defendant for drug use as well as the warrantless search of his home for drugs during his period of pretrial release. The defendant understood and consented to these conditions. He also agreed not to possess a firearm.

Shortly after his release, a supervision officer received a tip that the defendant was in possession of a handgun, a sawed-off shotgun, and drug paraphernalia specific to the manufacture of methamphetamine. Officers went to the defendant's home to conduct a compliance visit and the defendant invited them inside upon their arrival. The defendant submitted a urine sample indicating that he had been using methamphetamine, at which point he was handcuffed and asked whether he had any weapons. He admitted to having "several toy guns" and, when asked where these toy guns were, he gestured to the television set in the room. When looking at the television set, one of the officers immediately spotted a nylon

holster that had a gun in it with both the grip and the barrel sticking out. It was a sawed-off shotgun.

The defendant was charged in federal court for possessing a shotgun, and he moved to suppress the shotgun and the statements he had made to the officers. The government argued that the officers reasonably suspected that the defendant was breaching his pretrial-release conditions. The district court granted the suppression motion, concluding that probable cause was needed to search the defendant's home. Finding that the officers lacked probable cause, the court held the search unreasonable in violation of the Fourth Amendment. The government then brought this interlocutory appeal.

## II.

The panel majority recognizes that this case presents "an issue of first impression in any federal circuit and the vast majority of state courts." Am. Op. at 6447. This may be because it is well established that trial courts have considerable discretion to place a defendant on pretrial release with reasonable conditions that (1) further the State's interest in protecting the community from the harms inherent in the charged criminal activity and (2) ensure the defendant's appearance in the subsequent judicial proceedings.

The panel majority supports its decision by arguing that pretrial releasees have suffered "no judicial abridgment of their constitutional rights." *Id.* at 6461. The panel majority's reasoning cannot be reconciled with cases holding that individuals charged with crimes but freed on pretrial release have a lesser expectation of privacy than the ordinary citizen, thereby allowing the imposition of reasonable pretrial-release conditions. *See*, *e.g.*, *State v. Ullring*, 741 A.2d 1065, 1069 n.3, 1073 (Me. 1999) (concluding that probable cause is not required to search the home of a pretrial releasee accused of drug offenses); *In re York*, 892 P.2d 804, 813 (Cal. 1995). The Supreme Court has similarly held that a pretrial releasee is

considered in some ways to be in custody. *See Hensley v. Mun. Ct.*, 411 U.S. 345, 349 (1973) (noting that "a substantial number of courts, perhaps a majority, have concluded that a person released on bail or on his own recognizance may be 'in custody' " and this line of cases "reflects the sounder view").

The concept that a pretrial releasee has a diminished expectation of privacy from that of an ordinary citizen is magnified by the fact that a pretrial releasee is saddled with greater burdens and is "scarcely at liberty[.]" *Albright v. Oliver*, 510 U.S. 266, 279 (1994) (Ginsburg, J., concurring). This concept of lessened constitutional demands in the unique context of pretrial release makes a great deal of sense. For instance, unlike the ordinary citizen, a pretrial releasee must appear in court at the state's command and "seek formal permission from the court . . . before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction." *Id.* at 278.

One of the most solid pronouncements of the diminished-expectation standard comes from a unanimous decision by the California Supreme Court in *York*. There, a state magistrate judge asked a set of defendants who were charged with drug felonies to choose between remaining in custody pending trial or obtaining pretrial release based on conditions that included a requirement that they "[s]ubmit to drug [and, in some instances, alcohol] testing and [p]ermit search and seizure of his/her person, residence, and vehicle by any peace officer without a search warrant." 892 P.2d at 806 (alterations in original) (internal quotation marks omitted). The core argument presented by the defendants in *York*—that the Fourth Amendment is violated by the imposition of warrantless drug-testing and search conditions on pretrial releasees—mirrors the argument made by the defendant here. The California Supreme Court rejected this claim on the ground that pretrial releasees lack "the same reasonable expectation of privacy as that enjoyed by persons not charged with any crime[.]" *Id.* at 813. The court reasoned that such individuals have "no consti-

tutional right to be free from confinement prior to trial and therefore lack[ ] the reasonable expectation of privacy possessed by a person unfettered by such confinement." *Id.* The court further explained that "an incarcerated individual generally is subject to random drug testing and warrantless search and seizure in the interest of prison security" and that the subject conditions "do not place greater restrictions [on a] releasee's privacy rights than the releasee would have experienced had he or she not secured [ ] release." *Id.*

Unlike the panel majority in our case, the *York* court dismissed the notion that the challenged conditions impermissibly required a defendant to consensually "waive" any Fourth Amendment right that he may have otherwise retained had pretrial release been denied.[2] *Id.* at 811. The court noted that "the conditions simply define the degree of liberty that the court or magistrate, in his or her discretion, has determined is appropriate to grant to the [ ] releasee." *Id.* at 813. Nonetheless, the court recognized that such conditions should be reasonably limited based on "the relationship of the condition to the crime or crimes with which the defendant is charged[.]" *Id.* at 815 n.10. Finding the search and drug-testing conditions reasonable because they "clearly relate to the prevention and detection of further crime and thus to the safety of the public[,]" the court held that such warrantless searches and ran-

---

[2]The panel majority in the instant case admits that the "government is under no duty to grant" pretrial release to the defendant. Am. Op. at 6450. If that is so, why may a defendant not submit to searches in exchange for pretrial release? As Judge Bybee points out, "[i]n one sense, the government has no more 'induced' [the defendant] to forgo his Fourth Amendment rights in exchange for his liberty, than [the defendant] has 'induced' the government to forgo its right to require bail in exchange for the right to search him[.]" Revised Dissent at 6487 n.7. Rather than focusing on whether the Fourth Amendment allows the defendant to temporarily permit the State to search him, the more relevant question is whether the agreement was reasonable. As Judge Bybee notes, at the time when the defendant agreed to his pretrial-release conditions in exchange for release, he was in a much better position than this court to weigh the reasonableness of the government's proposal. *Id.* at 6487.

dom drug testing do not violate the Fourth Amendment. *Id*. at 810.

The panel majority's failure to accept the State's expressed interests is particularly troubling in this case, where drugs are directly at issue and the authorities supervising the defendant's pretrial release "must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before [the person] does damage to himself or society." *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987). The record shows that the defendant was arrested, *inter alia*, for felony drug-possession and the supervising authorities, pursuant to release conditions that defendant had agreed to follow, searched his home because the circumstances gave rise to a reasonable suspicion that he possessed drug paraphernalia and other contraband. Even assuming that the State had a lesser interest because the defendant had not been convicted, it does not follow that the State retained no interest in intervening before the defendant did "damage to himself or society." *Id*.

It is therefore apparent that the panel majority's new probable-cause rule fails the "touchstone" of Fourth Amendment analysis, which "is always 'the *reasonableness* in all the circumstances of the particular governmental invasion[.]' " *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)) (emphasis added). The panel majority should have examined the circumstances applicable to the defendant's pretrial release and then weighed the legitimate interests of the State against the defendant's privacy interests. Under the prescribed approach, the searches that took place in this case were constitutionally reasonable.

Moreover, the panel majority fails to heed the Supreme Court's recognition that the State's "interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987); *see also Speight v. United States*, 569 A.2d 124, 126-27 (D.C. 1989) (high-

lighting Congress's concern with the increasing level of crimes committed by defendants on pretrial release). The panel majority claims to accept that community protection is a compelling interest, but then brushes it aside by calling crime prevention "the exact opposite of a special need." Am. Op. at 6457. This is confusing. As Judge Bybee reasons in his dissent, "[t]he majority's point might be well taken if the courts were authorizing random searches of the general population." Revised Dissent at 6481. But there is no claim that such random searches are occurring. In fact, what the State permitted was a search of a specific individual, who has been charged with the violation of state drug laws and who had specifically consented to the search for drugs. He had the option of sleeping on a springboard cot in a cold jail cell or choosing to be surrounded by the comforts of his own home while the judicial proceedings against him moved forward. The latter choice came with some strings that were irrefutably related to the State's interest in preventing "more criminal activity by him after he is released[,]" NEV. REV. STAT. § 178.4853(9), but neither his choice nor these strings necessarily raise any constitutional problem.

The panel majority amends its original opinion in an attempt to clarify that a trial judge must make some kind of specific finding or "individualized determination" that certain search conditions are necessary for a defendant in order to make sure that he shows up for trial and to protect the community from further crimes. But this ignores the fact that an individualized determination *was* made.[3] The defendant here had already been arrested on probable cause for committing various drug offenses when he went before the state judge. Thus, there *was* a specific need to prevent *this* defendant from

---

[3]It seems a little disingenuous for the panel majority to suggest that the United States, which was not a party to the state court proceedings, somehow "concedes" that the state court proceeding was not individualized by noting that the conditions were "checked off by a judge from a standard list of pre-trial release conditions." Am. Op. at 6448.

continuing to use drugs if he was to be released into the general population. It is plain to see that the specialized findings the majority appears to contemplate have already been made.[4]

### III.

The majority's conclusion that "the assumption that [the defendant] was more likely to commit crimes than other members of the public . . . is contradicted by the presumption of innocence" is breathtaking and cannot be reconciled with reality or existing case law. Am. Op. at 6463-64. The Supreme Court has rejected this rationale:

> The presumption of innocence is a doctrine that allocates the burden of proof in criminal *trials*; it also may serve as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial . . . . *But it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun.*

*Bell v. Wolfish*, 441 U.S. 520, 533 (1979) (emphasis added) (internal citations omitted).

Other courts and Congress have also rejected the panel majority's presumption-of-innocence argument by treating charged individuals differently than the ordinary citizen. *See, e.g.*, 18 U.S.C. § 922(n) (punishing indicted defendants who receive or ship firearms in interstate commerce); 18 U.S.C. § 3577, subsequently renumbered as 18 U.S.C. § 3661 (imposing penalties by allowing consideration of prior

---

[4]I find troubling the majority's impression that, in lieu of specialized judicial determinations of the need to appear at trial, the legislature could act to authorize these conditions on drug defendants in order to prevent further criminal activity. The fact of the matter is that the legislature has already acted and Judge Bybee's dissent makes this point clear, and makes the added point that the consensual search conditions are not an authorization to search a member of the general public.

arrests); *United States v. Craven*, 478 F.2d 1329, 1339 (6th Cir. 1973) (deeming "eminently reasonable" a federal statutory classification that punishes indicted persons because the fact of a felony indictment is "so often indicative of a propensity for violence"); *Speight*, 569 A.2d at 128-29 (determining that a local statute's imposition of greater punishment for crimes committed by pretrial releasees as opposed to ordinary citizens does not violate the presumption of innocence). Even the Federal Rules of Evidence are contrary to the panel majority's presumption-of-innocence rationale. *See* FED. R. EVID. 404(b) (rendering evidence of other arrests admissible for the purpose of proving motive or intent). Accordingly, as noted by the Supreme Court, it is important to recognize that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling."[5] *Salerno*, 481 U.S. at 749.

---

[5]It is also worth noting that the majority's opinion has been criticized regarding its negative repercussions for criminal defendants and the defense bar in general. Judge Bybee observes in his dissent that the majority's opinion "is not a liberty-enhancing decision," Revised Dissent at 6488, because "[i]t is not hard to imagine that some jurisdictions will decide that releasing persons accused of crimes . . . without such conditions will not serve the public interest [and] may respond by . . . holding the accused pending trial." *Id.* at 6490. Such defendants will want to thank the majority for securing their Fourth Amendment rights as "they rest in the county jail." *Id.* at 6490. Judge Bybee's foresight has been echoed by the defense bar, noting that even though the majority is attempting to protect "the ideal espoused in our legal system that a citizen is innocent until proven guilty, . . . it is only fair to point to the problems that this may create from a policy standpoint. If all suspects charged with a crime retain all their rights if they are released, why would the state release them? I mean, they have to set reasonable bail, but if the accused cannot afford this bail, (so mainly the poor), they will have to remain behind bars until their trial." *http://www.blogdenovo.org/archives/001073.html* (last accessed June 1, 2006). Even the Harvard Law Review has criticized the majority's reasoning: "Although the [panel majority] boldly sought to protect privacy and liberty rights[,] . . . its reasoning suffers from [ ] significant limitations that undermine the effectiveness of the court's efforts and provide a means for future courts to diminish the Fourth Amendment safeguards the court so daringly sought to protect." 119 HARV. L. REV. 1630, 1630-31 (Mar. 2006) (footnotes omitted). The law review also states: "The importance of an opinion . . . often lies not in the specific outcome it

## IV.

The majority's discussion of "special needs" and "totality of the circumstances" fails to acknowledge that each judicial hearing on conditions of pretrial release is tailored to the individual defendant. The majority apparently does not believe the link between drug use and the risk of non-appearance is "obvious" because "the Nevada legislature has not taken the categorical position that drug use among pre-trial releasees substantially impairs their tendency to show up in court[.]" Am. Op. at 6458-59 & n.7.

While it may be true that the relevant state statute lacks such a specific pronouncement, it is not clear why the majority thinks such a pronouncement is necessary. As a federal court, we should be cautious to impose such conditions on a state legislature, especially where it was entirely reasonable for the state judge in this drug case to determine that a condition prohibiting alcohol and drug use was necessary to protect the public and secure the defendant's appearance in further proceedings.[6] Why is anything more necessary when, as here, the

---

reaches, but rather in the framework it lays down for the resolution of future cases. Thus, while the [majority's] holding purport[s] to protect privacy and liberty interests[,] . . . its reasoning threatens that aim." *Id.* at 1637 (footnote omitted).

[6]Almost every pretrial hearing (and certainly this one) is tailored to the individual defendant. Among other factors, the trial court considers the particular charges in determining whether a defendant poses a danger to the community or to himself, or is likely to appear at trial. Although the panel majority claims that "[t]here is no evidence that the [bail] conditions were the result of findings made after any sort of hearing" the record tells a different story. Am. Op. at 6448. In this case, the pretrial-release form was preprinted and gave the state judge the option of imposing twelve release conditions, each requiring a separate determination by the judge as to whether that condition would be necessary in the case at hand. The judge did in fact hold a hearing and specifically determined that eight of the twelve conditions served an important and useful purpose in this case, and he even fixed a handwritten notation that limited the kind of warrant-

conditions allowing for random drug testing and searches were rationally related to the State's interests in protecting its citizens and assuring the defendant's presence at trial? This unanswerable question signals the error in the majority's reasoning.

Furthermore, the premise that drug use creates a tendency for non-appearance is sound. Congress has determined that it is perfectly reasonable to assume that individuals arrested on drug charges pose a greater risk of non-appearance at trial.[7] In addition, the First Circuit has recognized and listed the "considerable evidence that drug offenders pose[ ] a special risk of 'flight[.]' " *United States v. Jessup*, 757 F.2d 378, 385 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). Citing from the record of Congress's Bail Reform Hearings held in 1981, the First Circuit observed that drug offenders account for about one-sixth of all crimes charged but about one-half of all bail jumpers. *Jessup*, 757 F.2d at 385. That court went on to note that a study conducted by the Administrative Office of the United States Courts revealed that about one-third of the defendants who do not appear for their pretrial hearings are charged with narcotics violations. *Id*. at 397-98. In sum, there is every reason to conclude that the search conditions imposed on the defendant in the instant case were reasonably calculated to

---

less searches that could be conducted. *See* Supplemental Excerpts of Record at 95:11-18 (Suppression Hr'g Tr.); *see also* Mot. to Suppress at 2:11-12; Release Order (E. Fork Justice Ct. Apr. 30, 2003). The judge expressly stated that such searches could only be made for the purpose of finding controlled substances and alcohol. I am bewildered by the majority's unwillingness to consider these established record facts.

[7]For example, 18 U.S.C. § 3142(e) establishes the presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," where an arrestee is charged with a drug-trafficking offense bearing a statutory maximum sentence of 10 years or more.

assure his appearance at trial and protect the community from the repetition of the alleged narcotics crimes.[8]

## V.

The panel majority does not quarrel with the fact that the defendant's signed pretrial-release agreement clearly expressed and unambiguously informed the defendant of the search conditions. In assessing the constitutionality of the drug test and the search of the defendant's residence, however, the panel majority minimizes the importance of the defendant's consent.

The panel majority calls the defendant's consent an "unconstitutional condition" whereby the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the right at issue. *Id.* at 6450-52. There are two readily perceived problems with this line of reasoning. First, as Judge Bybee notes in his dissent, no court has ever suggested that Fourth Amendment rights cannot be temporarily limited by agreement, at least not when the agreement is rationally related to changes in the individual's legal status. *See Wyman v. James*, 400 U.S. 309, 326 (1971) (allowing the conditioning of family-welfare payments on the recipient's submission to warrantless searches of her home).

Second, defining a defendant's consent to conditions of pretrial release as the panel majority has done detracts from

---

[8]The State may also want to impose pretrial-release conditions involving random drug tests and warrantless searches for drugs to ensure that when the accused shows up for court he is not under the influence of any drugs. The State has a strong stake in preserving its judicial resources and these pretrial-release conditions help guarantee that a defendant charged with drug possession is physically and mentally prepared for proceedings so as to ward off delays or claims that he was unable to understand the proceedings or participate meaningfully in his case.

the real import for the unconstitutional-conditions doctrine. As the government notes in its petition for rehearing, the doctrine would apply, for example, where the State qualifies an accused's pretrial release on his agreement to forgo his First Amendment right to make public statements criticizing the government. There, the limitation of a constitutional right is not related to a state's legitimate interest in conditioning pretrial release. Here, the defendant was arrested on probable cause for possessing controlled substances and drug paraphernalia and was then released on his agreement to refrain from committing similar offenses and agreeing to drug testing and the warrantless search of his premises specifically for drug contraband. A search condition designed to assess the defendant's compliance with another condition of his release may be reasonably related to the benefit offered by the government as a *quid pro quo* and thereby not run afoul of the doctrine.

The question here is not whether *all* pretrial releasees must agree to *all* searches. Rather, we have a defendant who has been charged with drug offenses and who has agreed to searches limited to drug and alcohol use on the basis of *reasonable* suspicion rather than requiring a warrant based on probable cause. Why is this not a reasonable bargain for being released on personal recognizance?[9]

## VI.

Finally, I am deeply concerned that the panel's novel approach has effectively revoked important pretrial-release procedures throughout our circuit and has created many uncertainties to bedevil the state and federal trial courts. Judge Bybee's list of states that have pretrial rules similar to the one at issue here dispels any uncertainty about the considerable

---

[9]Assuming that a pretrial releasee may have more "rights" than a probationer still begs the question: Why should the defendant be constitutionally prohibited from making this bargain? The panel majority's opinion creates more questions than it answers.

impact of the panel majority's opinion.[10] Revised Dissent at 6488-89. In fact, *every* state in our circuit, from Arizona to Alaska, has a similar rule. *Id.* at 6488. The federal government is also impacted—despite the majority's murky disclaimer that its decision "express[es] no view on this point"—as the federal government enjoys the same kind of broad discretion where pretrial releasees are concerned. *See* 18 U.S.C. § 3142(c)(1)(B)(xiv) (permitting pretrial release subject to "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community"). Indeed, the standard pretrial-release form used by all federal district courts provides as a release condition that the defendant "submit to any method of testing required by the pretrial services office or the supervising officer for determining whether the defendant is using a prohibited substance." 7 Fed. Proc. Forms § 20:110 ("AO Form 199B").

While the majority attempts to limit the impact of its ruling on the federal pretrial program, it is difficult to imagine why the majority's reasoning would not apply to federal-pretrial cases. As Judge Bybee presciently observes, the majority's decision would invalidate the federal government's pretrial-release search conditions unless federal pretrial officers can first demonstrate probable cause to support those conditions. Revised Dissent at 6490. The impact has been immediate. To be sure, in the Central District of California, a district that reportedly has one of the highest number of drug offenses in the nation, district judges have informed the relevant supervision authorities not to enforce any drug-testing or warrantless-

---

[10]The panel majority may want us to believe that its decision only affects Nevada, but this *ipse dixit* is not persuasive. The proof is in the pudding: a Montana state court has already found that the panel majority's opinion applies to Montana's pretrial-release procedures, holding that "if the government cannot make the requisite special needs showing, law enforcement needs to have probable cause to search a pretrial individual." *State of Montana v. Hurlbert*, No. DC-05-242, 2006 Mont. Dist. LEXIS 19, at *13 (Mont. 18th Jud. Dist. Ct. Jan. 30, 2006).

search conditions in existing pretrial-release orders. These judges have determined that the panel majority's ruling flatly prohibits them from imposing such conditions.[11]

The majority's amended opinion does not alleviate these concerns nor the widespread apprehension that its novel approach will affect the validity of other pretrial-release conditions imposed for the protection of the community. The regime ushered in by the majority places additional burdens on the federal and state governments that are already tasked with the difficult job of monitoring and enforcing compliance with pretrial-release conditions. What is most unfortunate is that the majority claims to accomplish these ends in the name of the Fourth Amendment by insisting in an unprecedented manner that defendants released pending trial have not suffered a judicial abridgment and that the presumption of innocence is applicable to the determination of pretrial release. Failing to rehear this case en banc, we regrettably succumb to a dangerous, disruptive, and poorly conceived sea change foisted upon all of the states and federal districts encompassed by the Ninth Circuit. Allowing the panel majority's decision to stand distinguishes our circuit's pretrial-release procedures from every other circuit in a manner detrimental to both prosecutors and defendants alike. Our only hope can be for the Supreme Court to steer us back on course. For all of the fore-

---

[11]The government knows of at least one brave magistrate judge who has broken rank by determining that the panel majority's decision does not apply to federal pretrial releasees. Nonetheless, other federal judges have imported the panel majority's reasoning into the federal pretrial-release context. For example, in *United States v. Skirving*, the district court and the government shared the view that the panel majority's decision *does* apply to federal pretrial-release conditions. *Skirving*, No. 01-321-04, 2005 U.S. Dist. LEXIS 38854, at *4, *9, 2005 WL 3436525, at *1, *3 (D. Or. Dec. 14, 2005). This is not surprising given that the standard federal pretrial-release form includes a provision that gives pretrial-release officers the apparent discretion to require "any method of testing." AO Form 199B (entitled "Additional Conditions of Release"). Despite the revisions in the majority's amended opinion, federal judges and U.S. Attorneys have every reason to wonder what they are supposed to do in the future.

going reasons, I respectfully dissent from today's order denying en banc review.