**UNITED STATES of America,**
**Plaintiff,**

v.

**Douglas AVILES, Defendant.**

**Case No. 16-cr-00371-VC-1**

United States District Court,
N.D. California.

Signed 01/11/2017

Jerome Philippe Mayer-Cantu, U.S. Department of Justice, San Francisco, CA, for Plaintiff.

## ORDER DENYING MOTION TO SUPPRESS

VINCE CHHABRIA, United States District Judge

Douglas Aviles has moved to suppress evidence from a search conducted pursuant to a probation condition that authorized law enforcement officers to search his residence without suspicion. Because the search condition was valid, and because the search was not otherwise unreasonable, the motion to suppress is denied.

### I.

Prior to 2015, Aviles was convicted of fourteen crimes, including six felonies—most committed while he was on probation, out on bail, or in prison. *See* Opp'n Exs. A, B. Several of the incidents leading to convictions involved violence or dangerous weapons. *See id.* Aviles also had ties to the Norteño gang, and he was implicated in a gang-related assault in March 2010. *See* Opp'n Ex. C.[1]

In July 2015, while in jail, Aviles repeatedly punched a half-inch thick security-glass window in his holding cell door until the glass broke. *See* Opp'n Ex. E. He pled guilty to a charge of felony vandalism and was sentenced to three years of probation. *See* Opp'n Ex. F. The probation order included a condition permitting any law enforcement officer to search Aviles's residence without a warrant and without any level of individualized suspicion. *See* Opp'n Exs. F, G.

The San Mateo Probation Office initially assigned Aviles to a probation division that conducts intensive supervision. *See* Opp'n Ex. E. His probation file showed that he had performed poorly on probation in the past and that he was expected to be "marginally compliant." *See* Opp'n Exs. A, I. In March 2016, a probation officer searched Aviles's residence and did not find any contraband. Around this time, Aviles also found full-time employment. His apparent progress led the San Mateo Probation Office to reassign him to a division that conducts less intensive supervision. *See* Opp'n Ex. E.

Nonetheless, Aviles's criminal history and gang ties brought him to the attention of Antonio Villalobos, a deputy in the Gang Intelligence Unit of the San Mateo Sheriff's Office. *See* Opp'n Ex. D. As part of his job, Villalobos was responsible for identifying subjects on probation or parole potentially involved in criminal street gang activity. During the summer of 2016, Villalobos reviewed a list of people serving terms of active probation in San Mateo County—a list that included Aviles. He noticed that Aviles had previously been charged with participating in a criminal

---

1. This factual background is drawn primarily from the exhibits to the government's opposition to the motion to suppress. At least for the purposes of this motion, Aviles has not contested the accuracy of the government's declarations and exhibits.

street gang, so he contacted the San Mateo County Probation Office to explore the possibility of investigating Aviles further. The Probation Office referred the case to Deputy Probation Officer April Decarsky, with the recommendation that Aviles be searched. Decarsky reviewed Aviles's criminal history, noted that Aviles had spent time in prison, and confirmed the conditions of Aviles's probation. *See* Opp'n Ex. H.

Decarsky and two other officers performed a warrantless search of Aviles's residence. *See* Opp'n Exs. H, J. When the officers arrived at Aviles's home, they confirmed with his sister that it was his residence, saw photos of Aviles on the wall of his bedroom, and saw utility bills addressed to Aviles. *See* Opp'n Ex. J, at 4-5. In Aviles's bedroom, the officers found drugs, drug paraphernalia, three guns, an apparent homemade explosive device, a switchblade knife, an inert missile-shaped object, a flak jacket, bulletproof vests, approximately $1,500 in cash, and several objects indicating gang membership. *See id.* at 3-6. The United States Attorney's Office is now prosecuting Aviles for being a felon in possession of a firearm, and Aviles has moved to suppress the evidence from the search.

## II.

When law enforcement officers search a probationer, the reasonableness of the search is assessed under "the totality of the circumstances." *See United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *United States v. King*, 736 F.3d 805, 808 (9th Cir. 2013). But the parties disagree about how courts should conduct this analysis in cases where the probationer is subject to a search condition imposed by the judge who gave him probation.

The government essentially contends that when a probationer is subject to a search condition, and when the search performed by the officer is within the scope of the search condition, and when the search condition imposed by the sentencing judge is valid, that is usually the end of the inquiry. According to the government, a search that meets this description will, by definition, be "reasonable" within the meaning of the Fourth Amendment (unless the search was executed in an unreasonable manner).

According to Aviles, the inquiry is more complicated, at least with respect to suspicionless searches of non-violent felony probationers. Aviles argues that even if the probationer is subject to a suspicionless search condition, and even if the officer's search was within the scope of the search condition, and even if the government demonstrates that the condition was valid when it was imposed by the sentencing judge, the government must do more to justify a suspicionless search of someone who is on probation for a non-violent felony. Aviles notes that the probationer's circumstances might change during his period of probation. The probationer might show no sign of reoffending during, say, the first year of a three-year probation term. He might be gainfully employed during that time and might show up for all meetings with his probation officer. In a situation like that, Aviles argues, even if a suspicionless search condition was valid when the sentencing judge originally imposed it, it might *become* invalid at some point during the probation period. In other words, according to Aviles, the balance between the probationer's privacy interests and the government's interest in keeping tabs on the probationer may shift during the probation period, such that officers may need some level of suspicion before searching the probationer, notwithstanding the search condition.

The government has the better interpretation of the case law. It's true, as Aviles notes, that courts often begin opinions in cases involving searches of probationers with a statement that they assess the reasonableness of the search in light of all the circumstances. This sounds different from mere assessment of the validity of the search condition, and it might be taken to imply that a valid search condition is not enough. But as a practical matter, at least in cases where the search conducted by the officer clearly falls within the scope of the search condition, the inquiry typically begins and ends with an assessment of the validity of the search condition imposed by the sentencing judge.

For example, *United States v. Knights* involved a search of a probationer's home pursuant to a search condition that authorized suspicionless searches. 534 U.S. at 114–15, 120 n.6, 122 S.Ct. 587. Everyone (including Knights himself) agreed that the officers had reasonable suspicion to search the home. *Id.* at 122, 122 S.Ct. 587. So the only question was whether a search of that type—by a law enforcement officer, without a warrant, but pursuant to a search condition—was reasonable at least so long as the searching officer had reasonable suspicion. The Court rejected the idea that a search of a probationer is rendered unreasonable by the fact that it's conducted by a law enforcement officer for general law enforcement purposes, rather than a probation officer for probation purposes. And the Court explained that it was reasonable for a probationer like Knights to be subject to a search condition like this. In reaching this conclusion, the Court balanced Knights's privacy interests against the government's interest in keeping tabs on probationers. With respect to Knights's privacy interests, the Court explained that "[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Knights*, 534 U.S. at 119, 122 S.Ct.

587 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). "The judge who sentenced Knights to probation," wrote the Court, "determined that it was necessary to condition the probation on Knights' acceptance of the search provision." *Knights*, 534 U.S. at 119, 122 S.Ct. 587. On the other side of the balance, the Court identified three primary government interests: (1) protecting potential victims from the recidivism of a probationer; (2) discovering criminal activity by a probationer and preventing destruction of evidence; and (3) improving the chances that the probationer will successfully reintegrate into society. *Id.* at 120–21, 122 S.Ct. 587. In other words, in assessing the validity of the search, the Court asked the same kinds of questions that a sentencing judge asks (or should ask) in deciding whether to impose a search condition in the first place. The Court did not inquire whether circumstances had changed since the search condition was imposed such that, even if it was valid when imposed, the officers couldn't rely on it later.

Another example is *United States v. King*, 736 F.3d 805 (9th Cir. 2013). In that case, the Ninth Circuit upheld a suspicionless search of King's home conducted by law enforcement officers pursuant to a probation condition. *Id.* at 806. First, the court interpreted the language of the search condition broadly, to cover a suspicionless search of King's home. *Id.* at 806 n.3. Then the court held that a suspicionless search condition for a probationer like King is valid. The court found that King's expectation of privacy was diminished, even compared to other probationers, because he had accepted the search condition after having been convicted of a "serious and intimate" offense for "willful infliction of corporal injury on a cohabitant." *Id.* at 808–09. Then the court recognized the same government interests laid out in *Knights*: protecting the public by catching

reoffenders, discovering criminal activity and preventing the destruction of evidence, and encouraging the successful completion of probation. *See id.* at 809. The court concluded: "a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment." *Id.* at 810. Thus, the focus in *King* was not on the facts known to the searching officers at the time they searched King. The focus was on whether the search fell within the scope of the search condition, and whether a suspicionless search condition was appropriate for that type of probationer.

This approach is consistent with the understanding of search conditions expressed roughly eight years earlier by the Ninth Circuit in *United States v. Scott*, 450 F.3d 863 (9th Cir. 2005). *Scott* involved a search conducted pursuant to a condition of pretrial release rather than probation, but the analytical framework was the same. The court effectively inquired into the validity of the pretrial release condition that authorized law enforcement to enter Scott's home to conduct drug tests without any suspicion. The government argued that Scott had "waived" his right to object to this intrusion because he "consented" to this pretrial release condition. But the court responded: "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *Id.* at 866 (citation omitted). This doctrine, the court explained, "is especially important in the Fourth Amendment context." *Id.* at 867. And the court held that the warrantless drug test of Scott in his home pursuant to his pretrial release condition violated the Fourth Amendment, because a person released before trial has a much greater expectation of privacy than a probationer, and the government has a weaker crime-prevention interest for a person merely accused of a crime (that is, someone on pretrial release) compared to someone who has already been convicted of one (such as a probationer). *Id.* at 872–74. Just as in *Knights* and *King*, the court in *Scott* focused on whether it was reasonable to impose that type of condition on a person like Scott. Because it wasn't, the search violated the Fourth Amendment.

Against all this, Aviles relies on *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016). He contends that while *King* established a rule that suspicionless search conditions for violent felony probationers are categorically valid, *Lara* created a different rule for when the probationer is a "non-violent felon." For non-violent felony probationers, Aviles contends, *Lara* stands for the proposition that officers may not simply rely on a search condition to conduct a suspicionless search; rather, they must inquire whether the probationer's circumstances have changed in a way that would require some level of suspicion to justify the search.

That's too broad a reading of *Lara*. Recall that in the cases previously discussed, the searches conducted by the officers were within the scope of the probationer's search condition (at least as the courts interpreted those conditions). *Lara* involved a suspicionless search of a probationer's cell phone that was, according to the Ninth Circuit, outside the clear scope of the probationer's search condition. *Id.* at 610–12. The court thus inquired into the probationer's circumstances at the time of the search, and into what the officers knew about those circumstances, to determine whether the search was reasonable. And the court concluded that, in light those circumstances (including the special privacy interests implicated by cell phones and the absence of facts suggesting Lara was engaged in criminal activity), the search violated the Fourth Amendment. That ana-

lytical approach may make sense in a case where the search condition doesn't clearly authorize the search the officers actually conducted. But *Lara* should not be read to alter the approach for deciding a case in which officers conduct a search that clearly falls within the scope of a search condition. The question in a case like that (assuming the officer does not execute the search in an unreasonable manner) is simply whether the search condition is valid.

 Stepping back from the case law, Aviles's proposed interpretation of *Lara* makes little practical sense. As the Supreme Court explained in *Knights*, it is not merely probation officers who can search a probationer with less than probable cause based on a search condition; law enforcement officers may do so for general law enforcement purposes. *Knights*, 534 U.S. at 121, 122 S.Ct. 587.[2] A law enforcement officer who encounters someone and learns that the person is a probationer subject to a suspicionless search condition is in no position to inquire whether that search condition still ought to apply. The officer typically cannot assess how the probationer has been doing—e.g., whether he's been reporting for meetings with his probation officer, whether he has a job, and whether he's been passing his drug tests—and then use that information to decide whether the search condition should still apply. It's the job of the sentencing judge to decide whether a probationer should be subject to a search condition, how long the condition should operate, how much of the probationer's property it should cover, and whether searches should require any level of suspicion. That decision is based on the kind of balancing the Supreme Court conducted in *Knights* and the Ninth Circuit conducted in *King*–a balancing of the probationer's privacy interests against the government's interest in keeping tabs on him. *See United States v. Betts*, 511 F.3d 872, 876 (9th Cir. 2007) (concluding on appeal from sentencing that a search condition on supervised release was valid based on the same balancing inquiry). If that balance changes substantially after the probation conditions have been imposed but before the probation period has expired, the probationer can go back to the sentencing judge and seek to modify the conditions of his probation. *See, e.g.,* Cal. Penal Code § 1203.3. What the probationer cannot do is expect a law enforcement officer to repeat the inquiry of the sentencing judge, on the assumption that the search condition might have become invalid some time during the period of probation.[3]

**2.** Although it analyzed the search in the totality of the circumstances, *Knights* did not overrule the special needs doctrine applied in earlier cases to uphold searches of probationers, conducted by probation officers, for a probation purpose. *See Griffin*, 483 U.S. at 873, 107 S.Ct. 3164. Neither party in this case has addressed whether the special needs doctrine might apply here given that the search in this case appears to have been conducted primarily by a probation officer (Officer Decarsky) for a probationary purpose (checking Aviles's progress on probation given the particular risks posed by his gang ties). This ruling assumes, as the parties seem to do, that the search of Aviles was conducted for general law enforcement purposes.

**3.** Another practical problem with Aviles's approach is this: he seems to be saying that if a non-violent probationer is subject to a suspicionless search condition, an officer nonetheless might need to have some level of suspicion short of "reasonable suspicion" before conducting the search. But there is no legally cognizable suspicion lower than "reasonable suspicion." *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("We do not think that the Fourth Amendment's emphasis upon reasonableness is consistent with the creation of a third verbal standard in addition to 'reasonable suspicion' and 'probable cause.' ").

■ The upshot is that, in a motion to suppress where the probationer was subject to a suspicionless search condition and where the officer acted within the scope of that condition, the true question is whether the government can prove that the search condition is valid, without further inquiry into whether circumstances changed since the imposition of the condition. If the government can meet its burden in this regard, the motion to suppress should almost always be denied. The exception would be a case where the officer executed the search in an unreasonable manner. *See Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."); *United States v. Penn*, 647 F.2d 876, 882–83 (9th Cir. 1980) (en banc) (Fourth Amendment " 'reasonableness' can be vitiated, however, by the manner in which the police conducted the search.").

### III.

Of course, proving the validity of a suspicionless search condition may not be easy. Although the probationer has, in some broad sense, "consented" to the condition in exchange for his release, it may be an unconstitutional condition. *See Scott*, 450 F.3d at 872; *see also* Section II, *supra*. If so, a suspicionless search conducted pursuant to the condition will almost certainly be unreasonable. The question, then, is whether Aviles's search condition is valid.

In *Knights*, the Supreme Court held that a law enforcement officer may search a probationer based on reasonable suspicion pursuant to a search condition. *Knights*, 534 U.S. at 121, 122 S.Ct. 587. The Court left for another day the question whether, and under what circumstances, a *suspicionless* search pursuant to a search condition would be consistent with the Fourth Amendment. *Id.* at 120, 122 S.Ct. 587 n.6.

In *King*, the Ninth Circuit upheld a suspicionless search of a probationer pursuant to a search condition that authorized it. 736 F.3d at 810. But King was a violent felon, so the court held only that suspicionless searches pursuant to search conditions for "violent felons" are constitutionally permissible. *Id.* It did not decide whether, and under what circumstances, a suspicionless search condition would be appropriate for "lower level offenders." *Id.*

■ Aviles notes that he was convicted of vandalism, which may or may not be violent. The felony status of his vandalism conviction is based on the estimated cost of the damage to the prison window, not the violent way in which he caused it. *See* Cal. Penal Code § 594(b)(1). Therefore, according to Aviles, he should not be considered a "violent felon" for whom *King* tells us a suspicionless search condition will always be valid; instead, he should be considered a "lower level offender" for whom a suspicionless search condition may or may not be valid. In other words, borrowing from federal sentencing law, Aviles argues that he cannot be considered a "violent felon" unless the crime of which he was convicted *necessarily* involves violence.

The "categorical approach" may or may not make sense in federal sentencing. *See Almanza–Arenas v. Lynch*, 815 F.3d 469, 483 (9th Cir. 2015) (Owens, J., concurring). But there's no reason to think that courts, in analyzing the validity of a search condition under the Fourth Amendment, should limit themselves in this way. After all, when sentencing judges impose conditions of probation or supervised release, they are supposed to consider the specific circumstances of the defendant to ensure that the conditions are properly tailored to him. *See, e.g.*, 18 U.S.C. § 3563(b). This includes the facts involved in the crime, the defendant's criminal history, and any other facts

or characteristics specific to the defendant. When courts are later called upon to inquire whether a search condition is valid in the context of a motion to suppress, there's no reason to prevent them from conducting the same kind of individualized inquiry. *See, e.g., Knights,* 534 U.S. at 121, 122 S.Ct. 587 ("We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of *this* probationer's house." (emphasis added)). *Cf. Betts,* 511 F.3d at 880–81 (considering the probationer's individual circumstances in reviewing probation conditions on appeal from sentencing). There's no reason to prevent the government, as it seeks to satisfy its burden to prove that the search condition is valid, from making a presentation about the actual conduct the probationer engaged in that resulted in his conviction, as well as the probationer's criminal history. By the same token, there's no reason to prevent the defendant, as he seeks to suppress the fruits of the search, from making a full presentation about why the search condition is not valid or why he should not be considered a "violent felon" like the probationer in *King.*[4]

With this understanding, Aviles's suspicionless search condition was valid in light of the conduct that resulted in his vandalism conviction, not to mention his fourteen prior convictions, several of which involved weapons or violence. Aviles's privacy interest was diminished by his status as a probationer who was convicted based on an act of violence, and who had been convicted for violent crimes in the past. The government's interest in a suspicionless probation search condition, in turn, was heightened by Aviles's circumstances. Given his long criminal history, Aviles was especially likely to reoffend during probation. He "performed abysmally" during a previous period of probation. Opp'n Ex. A, at 13. Several of his prior offenses involved the possession of drugs or weapons. Opp'n Ex. B. His gang ties also made him more likely to reoffend and gave the government an even stronger interest in keeping tabs on him. Indeed, Aviles does not appear to argue that the search condition was unreasonable when it was imposed. *See* Reply at 5-6. Instead, he relies on the argument, rejected in the previous section, that a search condition can become invalid at some point during probation even if it was valid when imposed.

Because the search of Aviles's home was indisputably within the scope of the search condition, because the search condition was valid, and because there is no indication that the officer executed the search in an unreasonable fashion, the warrantless and suspicionless search of Aviles's home was reasonable under the Fourth Amendment.[5]

---

4. *King* itself certainly does not suggest that a probationer may only be considered "violent" if he was convicted under a statute that covers *only* violent crimes. *King* did not teach how to identify a violent felon at all; it merely held that a "violent felon" (however you define that) may be subject to a suspicionless search condition.

5. Counsel for Aviles tepidly suggested at the hearing on this motion that the search was not clearly within the scope of Aviles's search condition because of a discrepancy in the wording that the judge used to describe the condition in open court and the summary of the search condition that was included in the minutes for the sentencing hearing. At the sentencing hearing, the judge stated as follows: "You're to submit to search and seizure of your person, place of residence, or area under your control or vehicle by any peace or probation officer during the day or night, with or without your consent, with or without a search warrant, and without regard to probable and reasonable cause." Opp'n Ex. F, at 5. Aviles verbally acknowledged that he understood and accepted this condition. Following the hearing, Aviles signed a copy of the sentencing hearing minute order, which also contained a description of his search condition: "Defendant shall submit to search and seizure of his/her person, place of residence

 

## IV.

Even taking Aviles's proposed approach for analyzing the constitutionality of the search, the search here would still be reasonable. If the "totality of the circumstances" approach really means that this Court must ask whether developments following imposition of the search condition mandated that officers possess some level of suspicion before searching Aviles's home, the answer to that question is "no."

Aviles concedes that, even under his approach, the search condition is important. Aviles's privacy interest in his home was "significantly diminished" by the search condition and his status as a probationer. *See Knights*, 534 U.S. at 120, 122 S.Ct. 587; *Lara*, 815 F.3d at 610; *King*, 736 F.3d at 809. Meanwhile, the government's interest in keeping tabs on Aviles was substantial. The violent nature of the conduct that led to Aviles's conviction, his extensive criminal history, and his suspected gang membership meant that Aviles was likely to reoffend, could be dangerous, and had gang connections. Aviles was searched as part of a larger program of searches by the San Mateo Sheriff's Office designed to prevent recidivism and promote successful completion of probation for suspected gang members. *See* Opp'n Ex. D, at 2-3. The lack of apparent problems during the first year of Aviles's probation period led Aviles to graduate to less rigorous supervision, but did not so reduce the government's interest in keeping tabs on him as to require some level of suspicion before conducting a search. The same is true of the fact that a prior search of Aviles did not turn up contraband and the fact that he had found a full-time job. In short, given his criminal history and the conduct that led to his probation, Aviles's apparent success during the first year of his probation did not tip the scales, in a totality of the circumstances analysis, to make the search of his home unreasonable.

**IT IS SO ORDERED.**

---

or area under his/her control, or vehicle, by any probation officer or peace officer, during the day or night, with or without his/her consent, with or without a search warrant, and without regard to probable cause." Opp'n Ex. G, at 2. On a blank slate, the latter description of the condition might be held not to authorize suspicionless searches, and the defendant might be held to get the benefit of the difference. But the court in *King*, citing California law, interpreted similar warrantless search condition language as authorizing suspicionless searches. *See King*, 736 F.3d at 806 n.3; *People v. Bravo*, 43 Cal.3d 600, 238 Cal.Rptr. 282, 738 P.2d 336, 342–43 (1987). Accordingly, the difference in wording between the sentencing judge's in-court statement and the written summary contained in the minutes is of no significance.